[No. A054946. First Dist., Div. Four. Apr. 9, 1993.]

CYNTHIA WILSON, Plaintiff and Appellant, v.
IRWIN MEMORIAL BLOOD BANK, Defendant and Respondent.

COUNSEL

Meis & Burgess, Meis & Waite, Fred G. Meis and Sara Jane Burgess for Plaintiff and Appellant.

Charles Bond, Stefanie Y. Gandolfi, Heather A. McKee, O'Connor, Cohn, Dillon & Barr and Duncan Barr for Defendant and Respondent.

OPINION

PERLEY, J.—In *Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 271 [7 Cal.Rptr.2d 101], we held that a blood bank sued for negligent failure to safeguard its blood supply is subject to a professional standard of care. Thus, if negligent failure to prevent transmission of the AIDS virus is alleged, it must be shown that the blood bank failed to exercise the degree of care ordinarily exercised by other blood banks under similar circumstances. (*Id.*, at p. 272.) In *Osborn*, we found no substantial evidence that the blood testing performed by Irwin Memorial Blood Bank in February of 1983 fell below this standard of care. We reach the same conclusion in this case with respect to Irwin's blood testing practices in November of 1983, and we therefore affirm the judgment for Irwin on appellant's claim of negligence.

I.

Appellant Cynthia Wilson contracted the AIDS virus in November of 1983 from a transfusion of blood supplied by Irwin. Appellant sued Irwin for medical negligence, alleging that Irwin had failed to adequately safeguard its blood in light of the risks associated with AIDS. In November of 1983 the cause of AIDS had not yet been identified and there was no test for the disease. However, appellant maintained that Irwin was negligent for failing to use a "surrogate" test on the blood it collected to try to screen out donors who might have AIDS. Appellant's principal theory of liability was that Irwin should have run the hepatitis B core-antibody (anti-HBc) test on the blood it collected. Appellant presented evidence suggesting that this test might have screened out the donor from whom she was infected. Alternatively, appellant argued that Irwin should have used a test that measured the

ratio of T helper cells to T suppressor cells in the blood (T-cell test).[1] The trial focused on the propriety of these tests from the standpoint of what was known about AIDS at the time.

The evidence presented here of developments through early 1983 was not materially different from the evidence we summarized in *Osborn v. Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at pages 259-266. Irwin's medical director, Dr. Herbert Perkins, again testified that from December 1982 Irwin acted on the assumption that blood could transmit AIDS. This concern led the Centers for Disease Control (CDC) to call a meeting of blood suppliers and other interested parties on January 4, 1983. The CDC presented preliminary data on more than 20 surrogate tests that might be used to identify the blood of people with AIDS. The anti-HBc and T-cell tests were among the most promising reported. Only about 5 percent of the general population would test positive for anti-HBc, but 88.2 percent of 93 homosexual or bisexual AIDS patients tested were anti-HBc positive. 79.2 percent of 149 homosexuals or bisexuals in a control group were also anti-HBc positive. Only about 3 percent of the population would be abnormal on the T-cell test, but 77.4 percent of 53 homosexual or bisexual AIDS patients tested were abnormal.

Appellant called Stanford Professor Byron Brown, a Ph.D. in biostatistics and mathematics, to analyze the CDC data. Dr. Brown explained that the CDC had labelled the anti-HBc and T-cell tests, among others, as "high sensitivity" tests because they yielded positive results in relatively high percentages of AIDS patients. These tests were also "high specificity" tests because they would be negative in high percentages of the general population. Based on the CDC data, Dr. Brown testified that the anti-HBc test was a statistically viable surrogate test for people at risk for AIDS. Brown said that "a test with that level of sensitivity and that level of specificity is a test of the quality that is often used in medicine for distinguishing between two groups of people . . . ." Based on the number of apparently healthy homosexuals or bisexuals who were positive in the anti-HBc test, Brown said it was "a test that you might consider as a surrogate test" for blood from a high-risk group.

No specific recommendations emerged from the January 4, 1983, CDC meeting, and no consensus was reached on the merits of surrogate testing, but it was suggested that blood banks research whether surrogate tests would

---

[1]Appellant also sought to hold Irwin liable for failing to allow blood donations to be earmarked for specific recipients. However, the court ruled as a matter of law that Irwin's directed donations policy did not violate the standard of care, and appellant does not challenge this ruling.

be effective. On January 9, Irwin's Dr. Perkins wrote that "[f]urther exper-imental studies [of the anti-HBc test] are clearly warranted." On January 13, the American Association of Blood Banks, the American Red Cross and the Council of Community Blood Centers issued a joint statement on AIDS and transfusions that advised against any routine implementation of surrogate testing for AIDS. Later in January, Perkins met with a group of physicians at the University of California at San Francisco Medical Center (UCSF). After the meeting, several UCSF physicians wrote a letter to Perkins and issued it to the press. The letter recommended that Irwin "investigate the feasibility of screening all donated blood for anti-HBc."

Two of the physicians who signed the letter, Dr. Marcus Conant, a dermatologist, and Dr. Paul Volberding, an oncologist, testified at appel-lant's trial. In the summer of 1981, they had started a clinic at UCSF for victims of Kaposi's sarcoma, a skin disease which was spreading among gay men and which was later identified as a symptom of AIDS. Dr. Conant said that since 75 percent of gay men were anti-HBc positive, and sexually active gay men were known to be at risk for AIDS, the anti-HBc test was one of the tests used at the clinic in early 1983 to identify people who might have been exposed to AIDS. Conant said that although he wanted Irwin to use the anti-HBc test, the letter asked only for an investigation of the test's feasibil-ity because "[w]e did not want to fight with Irwin" and "tried to be as diplomatic . . . as possible." However, Dr. Volberding testified that he had no way of knowing at the time the letter was written whether the anti-HBc test would be useful for the blood bank. Volberding said that the purpose of the letter was simply to have Irwin investigate the test to see if it would work.

Irwin responded to the physicians' letter with a press release on February 3, 1983, stating that it was "investigating the feasibility of conducting a pilot study to determine whether the test for anti-HBc should be introduced." Irwin initiated this study in March of 1983. Irwin tested over 6,000 donors for anti-HBc, and kept track of the results by gender and ethnic origin of the donor. Irwin also noted whether the blood was donated in San Francisco or outlying regions. Results for some of the San Francisco donors were broken down by residential areas based on zip codes listed on the donor cards. The numbers of homosexually active males living in those areas were estimated based on San Francisco Health Department AIDS statistics. The district reporting the highest number of AIDS cases was assigned a factor of 100 percent, another district reporting about half as many cases was assigned a

factor of 50 percent and so on. The results of the study were introduced into evidence and are set forth in the margin.[2]

Irwin found that the results it obtained based on gender, ethnicity and place of donation were identical to those that had been reached in multiple studies of anti-HBc before AIDS existed. For example, according to Irwin, it was already known that there was a higher incidence of anti-HBc in large cities than in small towns, and it was also known that Asians were more likely to test positive than other ethnic groups. However, Dr. Perkins said he was "bewildered" by the data for San Francisco donors. Irwin found that the area with the most reported AIDS cases, the Castro district, had fewer positive results on average than the city as a whole. An area bordering Chinatown had fewer AIDS cases than the Castro but twice as many positive results. Perkins concluded from Irwin's data that the anti-HBc test was more a measure of ethnic differences than of those at risk for AIDS.

Dr. Conant thought that there was "something wrong with [Irwin's] data," and he was critical of Irwin for failing to make the data public and failing to

[2]"STUDY OF ANTI-HBc AS A SURROGATE TESTS [*sic*] FOR AIDS 1983

Irwin Memorial Blood Bank

| | All Donors | | Males Only | |
| --- | --- | --- | --- | --- |
| | Number Tested | Per Cent Positive | Number Tested | Per Cent Positive |
| SEX | | | | |
| Males | 3,529 | 6.3% | | |
| Females | 2,647 | 4.5% | | |
| ETHNIC ORIGIN | | | | |
| Caucasian | 5,563 | 4.4% | | |
| Hispanic | 67 | 10.4% | | |
| Black | 261 | 13.8% | | |
| Asian | 80 | 26.2% | | |
| REGION WHERE DONATED | | | | |
| San Francisco | 4,451 | 6.8% | 2,000 | 8.2% |
| Marin | 1,252 | 3.9% | 477 | 4.0% |
| North Bay | 1,087 | 4.6% | 377 | 4.8% |
| Shasta | 1,232 | 3.3% | 667 | 3.0% |
| RESIDENTIAL ZIP CODES IN SAN FRANCISCO | | | | |
| All donors | 1,627 | 8.5% | 891 | 10.9% |
| 100% Gays* | 72 | 7.0% | 41 | 9.2% |
| 50% Gays | 109 | 9.2% | 55 | 15.3% |
| 1/3 Gays | 203 | 11.3% | 100 | 18.0% |
| 20% Gays | 310 | 8.1% | 154 | 12.3% |

*Estimate of per cent of homosexually active males in each ZIP code area provided by Dr. Selma Dritz, who, as Assistant Director of the Division of Communicable Diseases, was responsible for collection of AIDS statistics for the San Francisco Health Department."

conduct follow-up studies. In Conant's view, Irwin's study was a "fraud." Appellant's biostatistician, Dr. Brown, thought that Irwin's study "was a reasonably good study . . . given . . . the emergency of the time and the importance of the question." However, Brown testified that the results warranted further study and analysis. Brown noted that 14 percent of the males who lived in gay areas of San Francisco tested positive, versus only 9 percent of males who lived in other areas of the city. Brown said there was only a 1 percent chance that this difference would occur by random variation. If the difference stemmed from ethnicity rather than sexual orientation as Irwin claimed, this was not apparent from the figures Irwin provided.

In March of 1983, while Irwin was conducting its study of the anti-HBc test, the Food and Drug Administration (FDA) issued recommendations to blood banks regarding AIDS. The FDA did not recommend that blood banks perform any surrogate testing.

Dr. Perkins said Irwin's conclusion that anti-HBc testing would not work was based in part on the results of a study done in New York about the same time as Irwin's study. In the New York study, donors were given information about AIDS and asked to indicate on a confidential form whether their blood was safe to transfuse, or whether it was unsafe because of the risk of AIDS and thus should be used only for research. All of the blood was then subjected to the most promising surrogate tests mentioned at the CDC meeting, including the anti-HBc and T-cell tests. The researchers in New York concluded that none of the surrogate tests would be useful, and they so advised Perkins in June of 1983. Little difference appeared in the New York T-cell testing between blood that had been designated "safe" and "unsafe." Low T-cell ratios were found in 3.6 percent of the "safe" donations, and in 4.3 percent of the "unsafe" donations. Six percent of the "safe" donations and 11 percent of the "unsafe" donations were anti-HBc positive.

The higher percentage of anti-HBc positive results in the pool of "unsafe" blood was less significant to Dr. Perkins than the failure of the New York test to pick up 89 percent of those who felt they were at risk for AIDS. Perkins said that Irwin was under pressure from the gay community to surrogate test for AIDS instead of eliminating them as donors. Perkins was concerned that the introduction of a surrogate test would "bring forth a big influx of gay donors who wanted themselves tested for AIDS . . . . [¶] . . . And I was of the opinion then and am now that had we done it, we would have caused a lot more AIDS than occurred." This concern and others, including cost, the loss of donors, and the psychological trauma of surrogate testing for donors who tested positive, led Irwin not to adopt any surrogate test. Irwin was especially concerned about the potential loss of donors.

Perkins said that blood components have a limited shelf life, that the need for blood is unpredictable, and that with surrogate testing and AIDS-related donor questioning, "[w]e didn't know whether our input that year would be down 15, 20, 30 percent compared to our needs."

Perkins's concern that surrogate testing would have been counterproductive was echoed by Dr. Paul Holland, who testified for Irwin as an expert in blood banking. Holland ran the blood bank at the National Institutes of Health before taking over as medical director of Sacramento's regional blood center in September of 1983. Holland thought that the public would have equated surrogate testing with a test for AIDS. People who suspected they were at risk might have been led to donate blood to take advantage of the test, and people who tested negative might have been falsely reassured that they did not have AIDS. Holland said that the anti-HBc test would have been one of the worst choices among surrogate tests to use in San Francisco, because many of the city's young, sexually active gay men who were most at risk for AIDS had been vaccinated for hepatitis B, and thus would not have tested positive for anti-HBc. Holland said there was no evidence at the time that anti-HBc or T-cell testing would have been effective in screening for AIDS.

Appellant's expert in blood banking, Dr. Paul Engleman, took a different view of the 1983 evidence for surrogate testing.[3] Dr. Engleman had been medical director of the Stanford Medical School Blood Center since 1979. In Engleman's opinion, Irwin's study was "inconclusive" on the merits of anti-HBc testing. However, based on evidence, presumably from the New York study and the CDC, that 90 percent of AIDS patients and a significant percentage of apparently healthy gay men were anti-HBc positive, versus only 6 to 11 percent of the general public, Engleman thought that anti-HBc was a "reasonable surrogate marker." Engleman also thought that the New York study supported surrogate testing, because higher percentages of donors who thought their blood was "unsafe" were positive in the various surrogate tests studied.

Although Engleman was not aware of the New York study until it was published in 1985, his blood bank began using the T-cell test as a surrogate test for AIDS on July 1, 1983. Engleman stated: "It's important to point out that there was no proof positive that these surrogate tests were going to work in a definitive way, because we had not yet identified the causative agent of AIDS. Nonetheless, we deduced that the presence of the abnormality in a high portion of the patients that were affected with the disease and a high

[3]Dr. Engleman was unavailable to testify at trial, so portions of his deposition were read into the record.

proportion of the members of high-risk groups and the lack of these abnormalities in the general population was sufficient evidence to move ahead."

The Stanford blood bank ran the T-cell test on all of the blood it collected, but it did not collect enough blood to supply all of the blood used at Stanford's medical center. Dr. Engleman said that Peninsula Blood Bank was the main supplemental supplier, and that Peninsula provided close to 30 percent of the blood used at Stanford in 1983. Peninsula did not perform any surrogate test for AIDS until March or April of 1984, when it began using the anti-HBc test. Stanford's blood bank discarded the blood that was abnormal on its T-cell test. Engleman did not recall advising any of the physicians at Stanford that the blood collected at Stanford was any safer than the blood supplied by Peninsula.

On July 1, 1983, Irwin issued a news bulletin about AIDS. The bulletin advised that blood banks were safeguarding against possible AIDS-infected donors by giving donors information about AIDS, and asking donors AIDS-related questions about their medical histories. The bulletin also stated that "[r]esearchers are evaluating some of the 'surrogate' or substitute test[s] for AIDS for possible routine use. Currently, there are no laboratory tests specifically for AIDS, but substantial efforts are underway to develop such a test." The July 19, 1983, minutes of Irwin's Blood Bank Commission, which acts as Irwin's board of directors and has final authority for its policies, noted that "Stanford is . . . advertising that their blood is tested by a unique test that nobody else is able to do. The test they are performing, helper-suppressor, is in Dr. Perkins' opinion useless."

On September 26, 1983, the California AIDS Task Force, then chaired by Dr. Conant, issued a consensus statement about AIDS. Under the heading "Blood Transfusions, Blood Banks and AIDS Risks," the statement noted that there was no direct evidence of transmission of AIDS via blood, and that "after more than 2 years of national AIDS surveillance, the data show that the incidence of AIDS is very low in blood recipients." The statement did not recommend that blood be surrogate tested for AIDS.

According to the evidence, as of November 1983, among the more than 2,000 blood banks and transfusion centers in the United States, Stanford was alone in its practice of surrogate testing for AIDS. At that time, no governmental agency or professional association recommended surrogate testing. There is no evidence that such testing had been endorsed or recommended in any professional journal.

Dr. Perkins and Dr. Holland opined as experts in blood banking that the standard of care for blood banks in November 1983 did not require surrogate

testing. Dr. Conant opined as an AIDS expert that anti-HBc testing would have been "very effective in screening out many, though, not all people who were at risk of being exposed to the AIDS virus." Dr. Engleman opined as a blood banking expert "that surrogate testing was a good idea, that it should have been done." Engleman said that he had encouraged other Bay Area blood banks to begin some form of surrogate testing in 1983. He gave a lecture on the subject at UCSF in September or October of 1983.

Dr. Engleman "regret[ted] that other blood banks didn't initiate surrogate testing when we did. And I regret outside of the Bay Area blood banks decided not to do surrogate testing. I think it was a terrible mistake and . . . I don't think that there's much controversy about that in retrospect." Engleman said that "in retrospect the evidence is very good that surrogate testing worked, not just T-cell testing, but [anti-HBc] testing as well." Engleman said that in tests performed after discovery of the AIDS virus, 10 percent of those who were T-cell abnormal turned out to be HIV positive versus less than one-half of 1 percent of those who were T-cell normal. Thus, "only one out of 1000 was positive that we missed."

Engleman said that it was a judgment call whether to surrogate test in 1983, but that such testing would have been the "best judgment." Engleman said that he and Irwin had an "honest disagreement" on the subject. When asked whether Irwin, as a reasonably prudent blood bank, should have instituted surrogate testing in 1983, Engleman responded: "I'm saying that we felt it was needed. I'm not saying that there wasn't room for disagreement. Certainly there was disagreement. [¶] We felt that the prudent thing to do was to surrogate test the blood. I can't, you know—I can only speak for what we felt and what we did. Obviously we were the only blood bank or the first blood bank in the country to pursue this approach, and there was obviously somewhat violent disagreement and negative reaction by the other blood banks to our decision. [¶] Nonetheless, we felt then and we feel now that we were correct. We would have much preferred had Irwin and the other [blood] banks moved much more quickly than they did. [¶] I'm not sure if I'm giving a direct answer to your question."

Engleman testified that the anti-HBc test was easier to administer than the T-cell test because the equipment for it was more readily available and it could be performed on stored blood. On the other hand, the anti-HBc test was a "less attractive" surrogate than the T-cell test because a substantially higher percentage of people were positive for anti-HBc, and more blood would have to be discarded if that test were used. It would have been "extremely difficult" but "not impossible" for Irwin to have used the T-cell test. Anti-HBc testing would have been the "more practical alternative," but

Engleman could "only render an opinion that what was the best for Irwin would be up to Irwin." Engleman said that the potential loss of donors through anti-HBc testing "clearly weighed in our initial decision to go with T-cell testing."

The court determined that Dr. Engleman's testimony was sufficient to preclude a nonsuit on appellant's claim that Irwin was negligent for failing to surrogate test in November of 1983. The jury deliberated over most of a day before returning a nine-to-three verdict for Irwin.

## II.

Appellant's claims on appeal are that the court erred: (1) in ruling that Dr. Conant was not qualified to render an opinion on Irwin's compliance with the standard of care for blood banks in 1983; (2) in excluding evidence that Irwin eventually instituted anti-HBc testing in the spring of 1984; and (3) in instructing the jury pursuant to BAJI No. 6.03 (1991 rev.) (7th ed. pocket pt.) that Irwin could not be found negligent if it used a "recognized" method of collecting and providing blood, even if the "approved" method it selected "later turns out to be a wrong selection or one not favored by certain other blood banks." Since no prejudice can be demonstrated on any of these matters we will not reach the merits of appellant's claims.

In *Osborn*, we concluded that Irwin was not negligent, as a matter of law, for failing to anti-HBc test in February of 1983 in light of the uncontradicted evidence that no blood bank in the nation was using that test at that time. (*Osborn* v. *Irwin Memorial Blood Bank, supra*, 5 Cal.App.4th at p. 282.) Thus, for all of the reasons we noted in *Osborn*, the undisputed evidence in appellant's case that no blood bank used the anti-HBc test in November of 1983 is dispositive of her claim of negligence with respect to anti-HBc testing.

In *Osborn*, we also held that Irwin could not be found negligent for failing, prior to February of 1983, to ask donors about their sexual orientation to determine if they were at risk for AIDS. (5 Cal.App.4th at p. 283.) This decision was based on the evidence in *Osborn* that such questions were asked at only one blood bank at the time and were not yet endorsed by any regulatory or professional group. The same is true of the evidence in appellant's case on the subject of T-cell testing. Stanford's medical center ran the T-cell test on a portion of the blood used there in November of 1983. At that time, no other blood bank ran this test and no regulatory authority or blood banking association recommended that it be used.

In these circumstances, notwithstanding Dr. Engleman's opinion that surrogate testing "should" have been done, there is no substantial evidence

to support a finding that Irwin was negligent for not using such a test. (*Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at p. 282.) This conclusion would not be changed by the evidence appellant alleges was wrongly excluded.[4]

If Dr. Conant had been allowed to opine that Irwin's conduct fell below the standard of care for blood banks in November of 1983, we will assume that, unlike Dr. Engleman, he would have couched his opinion in the strongest possible terms. However, in light of the balance of the evidence in the case, such an opinion, no matter how forcefully rendered, would have amounted to no more than another statement about what "should" have been done. It is apparent from the evidence that there were reasonable differences of opinion on surrogate testing in 1983. Viewed most favorably to appellant, the evidence could support a finding that Irwin did not exercise the "best" judgment on the subject. It could even be said in retrospect that Irwin made the "wrong" decision. The issue, however, is not whether there can be any reasonable disagreement about the propriety of Irwin's actions, or whether those actions were right in retrospect. The issue is whether, in performing its professional services, Irwin adhered to the actual or accepted practice among blood banks at the time.

As we observed in *Osborn,* this view of professional duty is long-established in this state, favored by most commentators, and followed in a majority of other jurisdictions.[5] (*Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at pp. 275-283.) This view is reflected, for example, throughout the opinion in *Brown* v. *Colm* (1974) 11 Cal.3d 639 [114 Cal.Rptr. 128, 522 P.2d 688], which appellant cites in support of her argument that Dr. Conant was erroneously precluded from opining about the duties of blood banks. ▇ "It is settled," the *Brown* court wrote, "that a doctor is required to apply that degree of skill, knowledge and care *ordinarily exercised* by other members of his profession under similar circumstances." (*Id.,* at pp. 642-643, italics added.) At issue was a doctor's ability to opine "as to the *prevailing standard used* in the repair of" the medical problem in question. (*Id.,* at p. 645, italics added.) The court noted that a

---

[4]This conclusion also obtains whether, as we assumed for purposes of *Osborn* v. *Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at page 273, blood banks in "similar circumstances" to Irwin included all "blood banks" as defined by Health and Safety Code section 1600.2, or some subset thereof.

[5]A recent commentary critical of the "professional custom" standard of care for medical practitioners (Silver, *One Hundred Years of Harmful Error: The Historical Jurisprudence of Medical Malpractice* 1992 Wis.L.Rev. 1193, 1216-1219) notes that most courts continue to adhere to this standard (*id.,* at p. 1213-1214; see, e.g., *Smith* v. *Paslode Corp.* (E.D.Mo. 1992) 799 F.Supp. 960, 971 [American Red Cross (ARC) granted summary judgment on claim of negligent screening for AIDS because evidence did "not show that blood bank professionals generally were engaging in a screening procedure different from that procedure used by ARC"]).

physician would be "deemed qualified as an expert if he could testify to the *practice* in a similar community." (*Id.*, at p. 646, italics added and deleted.) All of these statements presume, as we concluded in *Osborn*, that the professional standard of care is defined by custom and practice.

 *Brown* v. *Colm* also confirms that the issue in appellant's case is whether Irwin's blood testing procedures were consistent with accepted practice in November of 1983, and not whether they comported with practices that evolved in succeeding months. *Brown* held that a doctor was not automatically disqualified from opining about a medical procedure used in 1949 simply because he did not begin practicing medicine until 1959. The court indicated that the doctor's opinion would be based on his examination of relevant literature as well as his training and experience after 1959, and that "[h]e was offering his opinion only as to whether the practice was the same 10 years previously." (*Brown* v. *Colm, supra,* 11 Cal.3d at p. 644.) The court made it clear that the lawsuit turned on what it described as "the standard of care prevailing in 1949," or simply "the 1949 standard of care." (*Id.*, at p. 643.)

In this case the court admitted little of the evidence appellant proffered of developments in blood banking after the transfusion that caused her infection. The jury was apprised of internal memos at Irwin in December of 1983 which cast some doubt on whether donor questioning was effectively excluding people who were at risk for AIDS. Dr. Perkins asked for a comparison between the ratio of male to female donors in 1982 and 1983, on the theory that "[i]f we really did eliminate a large proportion of former donors who were gay males, we should expect to see a change in the proportion of females to males among our donors." It turned out that the percentage of male donors dropped only slightly from 60.67 percent in 1982 to 59.86 percent in 1983. A portion of the January 24, 1984, minutes of Irwin's Blood Bank Commission were admitted, revealing plans to meet with hospital administrators to discuss "the scientific data relevant to [anti-HBc] testing and financial consequences of implementing such a program." The jury learned through Dr. Engleman that Peninsula Blood Bank began anti-HBc testing in March or April of 1984. Dr. Conant mentioned that Irwin did not implement anti-HBc testing until May of 1984, but this testimony was stricken and it almost resulted in mistrial.

The court excluded various documents covering the period from appellant's transfusion to Irwin's adoption of the anti-HBc test. Among these documents were November 21, 1983, minutes of Irwin's Scientific Advisory Committee, which reported to Irwin's Blood Banking Commission on medical and scientific matters. The minutes cited "agreement that none of the

available nonspecific tests for AIDS had been demonstrated to be useful for detection of donors who might transmit AIDS," but concern that "the Stanford example was prompting public pressure for testing nonetheless." November 22, 1983, minutes of the Blood Bank Commission state that one member of the Scientific Advisory Committee was "strongly urging that we consider instituting [the anti-HBc test] on a routine basis."

According to minutes of the Scientific Advisory Committee on January 10, 1984, the American Association of Blood Banks, the American Red Cross and the Council of Community Blood Centers issued a new joint statement on AIDS on December 28, 1983. Like the joint statement of these groups in January of 1983, the new statement opposed surrogate testing for AIDS.

However, these January 1984 minutes also noted that in December 1983, the Blood Products Advisory Committee to the FDA had recommended that manufacturers of plasma derivatives agree voluntarily to begin anti-HBc testing. Although the FDA committee "specifically stated that they were not calling on the volunteer donor blood banks to do this," a majority of the Scientific Advisory Committee voted on January 10 for routine anti-HBc testing of all Irwin donors. This decision was reached after Dr. Perkins presented a summary of the arguments for and against such testing. The decision "was based on the probable prevention of additional cases of post-transfusion hepatitis and the possible elimination of additional carriers of AIDS." It was also agreed that hospitals "be consulted about their willingness to accept further significant increases in the prices for blood components in order that this test may be done."

On January 24, 1984, Irwin's Blood Bank Commission received the Scientific Advisory Committee's recommendation, and voted to invite hospital representatives to the next commission meeting "to get feedback/counsel regarding implementing [anti-HBc] testing and its final impact." On February 6, 1984, Irwin sent a memo to hospital administrators and others outlining the arguments for and against anti-HBc testing, in preparation for a meeting on February 21 to discuss the subject.

The arguments Irwin presented in favor of anti-HBc testing were that it could decrease the frequency of post-transfusion hepatitis and transfusion-associated AIDS. On the subject of AIDS prevention, Irwin stated that "89% of homosexually active males have anti-HBc," and "[t]o the extent that gays

who should not donate are still giving blood, up to 89% of them would be eliminated by this test." The arguments listed against anti-HBc testing were that it would eliminate 5 to 7 percent of Irwin's donors and increase the cost of blood. Irwin stated that the test would eliminate "more of the older (more loyal) donors and of the ethnic minorities whose blood types we need," thereby increasing the risk of blood shortages. Irwin advised that the test would cost a total of $1.2 million, and fees would rise by approximately $5 per blood component.

Dr. Perkins had voiced essentially these same objections at a meeting of the FDA Blood Products Advisory Committee in December of 1983. At that meeting Perkins said, ". . . we all, obviously, would be for [anti-HBc testing] if it did not cost money, cost donors or upset people. . . . [¶] . . . [W]e are sitting on the threshold of a whole series of tests which may be much better. So I would plea[d] for a limited period of wait and see." On February 9, 1984, Dr. Perkins wrote a memo to Irwin's executive director on the results of a study of a new anti-HBc test, which appeared to be about twice as sensitive as the test then licensed. Perkins wrote, "How would you like to lose 14% of your donors?"

On March 27, 1984, Irwin issued a news bulletin announcing that it would begin anti-HBc testing on May 1. The release emphasized that there was not yet any test for AIDS, and that the anti-HBc test would not detect AIDS. The release added that "with few exceptions," people who were anti-HBc positive "should have no concern that [the antibody's] presence indicates illness."

■ Appellant contends that these subsequent developments were admissible to impeach Dr. Perkins on the grounds for his opposition to surrogate testing in 1983. However, appellant acknowledges that evidence of subsequent remedial measures is inadmissible to prove negligence (Evid. Code, § 1151), and the documentation of what transpired after appellant's transfusion does not supply any substantial evidence that Irwin breached the standard of care for blood banks in November of 1983. To the contrary, such evidence provides further proof that neither the government nor the blood banking associations recommended surrogate testing by blood banks at the relevant time. Accordingly, Irwin would have been entitled to judgment as a matter of law even if there were proper grounds to admit all of this additional evidence, and we need not reach the claim of instructional error.

### III.

The judgment is affirmed with costs to Irwin.

Anderson, P. J., and Poché, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 15, 1993. Mosk, J., Kennard, J., and George, J., were of the opinion that the petition should be granted.