MARIETTA ADVINCULA, Indiv. and as Special Adm'r of the Estate of Ronaldo Advincula, Deceased, Plaintiff-Appellee, v. UNITED BLOOD SERVICES, Defendant-Appellant.

First District (2nd Division)   No. 1—94—3168

Opinion filed August 22, 1995.

574

DiVITO, J., specially concurring.
McCORMICK, J., dissenting.

Jenner & Block, of Chicago (Jerold S. Solovy, Michael T. Brody, Jeralyn H. Baran, and Jeffrey W. Mayer, of counsel), and Lewis & Roca, of Phoenix, Arizona (Foster Robberson, of counsel), for appellant.

Margaret Byrne and Judith E. Fors, both of Chicago, and Holland & Hart, of Denver, Colorado (Maureen R. Witt, Elizabeth A. Phelan, and Carlos A. Samour, of counsel), for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Marietta Advincula (plaintiff) brought suit against United Blood Services (UBS), a blood bank, after her husband died of AIDS, which he contracted through blood supplied by UBS. For the reasons set forth below, we affirm the judgment of the circuit court entered on the jury's verdict in favor of plaintiff.[1]

UBS is an operating division of Blood Systems, Inc. (BSI), a not-for-profit corporation. As such, it collects blood from volunteer donors at mobile blood drives and distributes it to, *inter alia*, area hospitals.

On February 28, 1984, plaintiff's decedent Ronaldo Advincula (Ronaldo) underwent open heart-bypass surgery at Illinois Masonic Medical Center. During and after the surgery, he received five units of blood via transfusion, three of which were provided by UBS. In 1987, Ronaldo was diagnosed with acquired immunodeficiency syndrome (AIDS). He died from AIDS-related illnesses in April 1988, leaving his wife, plaintiff, and three daughters.

One of the units of blood provided by UBS was donated by "John Donor"[2] during a UBS blood drive at St. Rene's Catholic Church in the City of Chicago in February 1984. There is no dispute that John Donor tested positive for HIV in 1986 and that his blood was the source of Ronaldo's infection. HIV refers to the human immunodeficiency virus, a virus of the T-cell leukemia family which causes AIDS. J.E. Schmidt, M.D., 2 Attorneys' Dictionary of Medicine and Word Finder H-174 (1995).

Plaintiff filed her suit in the circuit court of Cook County on May 26, 1989, and in her third amended complaint, filed on April 30,

---

[1]Because of the page limitation on opinions ordered by the supreme court, section I of this opinion shall be published, while sections II, III, and IV shall be filed as an unpublished order. (See 166 Ill. 2d R. 23.) Justice DiVito's special concurrence and Justice McCormick's dissent will appear in the published opinion.

[2]The donor was referred to as "John Donor" throughout the proceedings in order to protect his anonymity.

1993, she alleged, *inter alia*, that UBS was negligent in procuring and in distributing John Donor's blood.[3] Recovery was sought pursuant to the Wrongful Death Act (740 ILCS 180/1 (West 1992)), the Survival Act (755 ILCS 5/27—6 (West 1992)), and the family expense law (750 ILCS 65/15 (West 1992)).

After a lengthy trial, the jury found in favor of plaintiff and awarded a total of $2.14 million in damages. The trial court denied UBS' post-trial motion for judgment *non obstante veredicto* (*n.o.v.*) or, in the alternative, a new trial. This appeal followed.

The history of the AIDS epidemic in the United States has been chronicled by several authorities. (*E.g., United Blood Services, a Division of Blood Systems, Inc. v. Quintana* (Colo. 1992), 827 P.2d 509; see generally Randy Shilts, And the Band Played On: Politics, People, and the AIDS Epidemic (1987).) For purposes of this opinion, a brief summary of the blood screening techniques available at the time Ronaldo received his transfusion is provided. Historical information is provided only insofar as necessary to explain the methods of blood screening.

UBS, like other blood banks, is regulated by the Federal Food and Drug Administration (FDA). (See 21 C.F.R. § 640.4 (1983) for the regulations in effect at the time Ronaldo received transfusions.) UBS is also subject to the standards set by the American Association of Blood Banks (AABB), a trade association which grants accreditation to blood banks that comply with its standards. The Council for Community Blood Centers (CCBC) is also a trade association, but it does not set forth standards for blood banks to follow.

AIDS is a fatal disease; infection with HIV results in the total collapse of the immune system. In 1982, it became apparent that AIDS was being spread through blood when AIDS was diagnosed in hemophiliacs and blood transfusion recipients. The recognized high risk groups included sexually active homosexual men, intravenous drug users, recently arrived Haitians, and sexual partners of members of those groups. A direct test for AIDS was not developed until 1985. At a meeting held by the Centers for Disease Control (CDC) in January 1983, the CDC suggested using surrogate testing, but blood bankers disagreed with this approach, citing the high expense and the possibility that the blood supply would become dangerously low. Although surrogate tests would detect 66% to 88% of AIDS-infected donations, they had about a 5% false positive rate, thereby resulting in the rejection of some safe blood.

Surrogate testing is an indirect means of evaluating a product. In

---

[3]Several other defendants were voluntarily dismissed.

the context of AIDS, prior to the existence of a direct test for AIDS, testing individuals for symptoms or conditions that commonly appear with HIV-infection was one way of discovering a donor's probable infection with HIV. As early as 1982, five surrogate tests were available, including the hepatitis B core antibody test. Hepatitis B afflicts many homosexual men and intravenous drug users.

Evidence in the record indicates that surrogate testing was used by at least two blood banks in early 1984, the time at which Ronaldo received his transfusion. However, most blood banks, including UBS, did not utilize surrogate testing.

A second available screening method was that of directed donations. Directed donations refers to the policy of allowing patients to receive blood from family or friends. In 1983, BSI adopted a policy permitting directed donations in communities where there was a demand for directed donations. UBS in Chicago did not adopt such a policy because of its apprehension that family or friends would feel pressured to give blood and to hide high risk factors, such as homosexuality or drug use.

Another available screening method was education and self-deferral of donors. This method was adopted by UBS and other blood banks. Prospective donors were educated as to which were the high risk groups for AIDS and encouraged not to donate if they were within one of those groups. An "Important Notice" was developed for distribution at blood drives. It contained written information on high risk groups for AIDS and informed potential donors of a code question which they would be asked prior to donating. The question was: "Are you in good health today?" If donors felt that they should not donate, they could answer in the negative and avoid any further potentially embarrassing questions. In addition, donors were informed that if they were at risk for AIDS, yet felt compelled to donate, they could call back after donating and confidentially request that the blood bank discard their donations. Interviewers at blood drives were instructed to interview donors in a confidential setting and to ask whether the donor understood the AIDS information.

Finally, direct confrontational questions regarding potential donors' sexual orientation and drug use could have been used, but this approach was not adopted by most blood banks. UBS and others felt that such questions would not be effective and would adversely affect the blood supply.

Within that framework, a discussion of the first issue raised by UBS follows. As noted above, the remaining issues will be addressed in a contemporaneously filed Rule 23 order.

## I

UBS first argues that the trial court erred in interpreting the Blood and Organ Transaction Liability Act (Blood Liability Act) (745 ILCS 40/3 (West 1992)), which sets forth the requisite standard of care for blood banks. UBS contends that the standard of care ought to be defined as the duty to take "due care to follow the standards of the profession."[4]

■ Ordinarily, the standard of care in negligence cases is that of the reasonable person. The issue for the jury is whether a reasonable and prudent person would have acted differently under similar circumstances. Kelly & Barber, *Legal Issues in Transfusion Medicine*, 12 Clinics in Laboratory Medicine 819, 821 (1992) (hereinafter *Legal Issues*); see generally M. Pollelle & B. Ottley, Illinois Tort Law § 14.10 (2d ed. 1993).

However, when the conduct of professionals is assessed, the law defers to a great extent to the standards developed and accepted by the particular profession. Thus, the jury is asked to compare the defendant's conduct with that of the other members of her profession in their community. (*Legal Issues*, at 821.) In litigation involving AIDS transmission through blood transfusions, defendant blood banks prefer to be judged by a professional standard of care, asserting, as UBS does, that they cannot be found negligent if they adhered to the standards and customs of the profession. Under this standard, the blood bank can defend its conduct by showing that it followed FDA regulations, AABB recommendations, and common practices of other blood banks. *Legal Issues*, at 822.

In a negligence action, the plaintiff is required to show by a preponderance of the evidence (1) a duty on the part of the defendant; (2) a breach of that duty; (3) proximate cause; and (4) damages. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226; see *Smith v. Eli Lilly & Co.* (1990), 137 Ill. 2d 222, 232, 560 N.E.2d 324, 328; *Carter v. Johnson* (1993), 247 Ill. App. 3d 291, 301, 617 N.E.2d 260, 301.) The concept of duty embodies the obligation " 'to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.' " *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 331, 211 N.E.2d 253, 257, quoting W. Prosser, Torts, at 331 (3d ed. 1964).

---

[4]The Blood Liability Act provides that blood banks are held to warrant that they have "exercised due care and followed professional standards of care." 745 ILCS 40/3 (West 1992).

In *Darling*, our supreme court held that custom was not conclusive on the duty owed by a hospital to its patients. In that case, a doctor employed by the defendant hospital placed a cast on the plaintiff's broken leg. His leg eventually became gangrenous and had to be amputated. The plaintiff alleged that the hospital was negligent in permitting the doctor to perform orthopedic services of the kind required by the plaintiff, in failing to exercise adequate supervision over the case through its staff, and in not requiring consultation after complications developed. The plaintiff prevailed at trial and on appeal. In the supreme court, the defendant argued that the trial court should have defined the standard of care as the standard customarily offered by hospitals in the community. The supreme court disagreed. The court noted that "[c]ustom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required." It went on to explain, however, that custom is not dispositive of the issue of duty because an entire profession may be negligent. *Darling*, 33 Ill. 2d at 331, 211 N.E.2d at 257.

The *Darling* court relied on the oft-quoted passage from *The T.J. Hooper* (2d Cir. 1932), 60 F.2d 737, in which Justice Learned Hand stated:

"There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. [Citations.] Indeed, in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." (*T.J. Hooper*, 60 F.2d at 740.)

We have similarly found that in a professional malpractice case, "[p]roper standards of practice in any profession *** are not conclusively fixed by local usage or general custom" and that while the defendant's adherence to custom or local usage is "indicative of due care," it is not definitive. (*Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 174, 392 N.E.2d 203, 209.) Implying that professional standards as reflected by custom and local usage can establish a rebuttable presumption of due care, we held that the presumption could be refuted by expert testimony that the custom or usage itself constituted negligence. *Chiero*, 74 Ill. App. 3d at 174, 392 N.E.2d at 209; see also *Lundahl v. Rockford Memorial Hospital As-*

*sociation* (1968), 93 Ill. App. 2d 461, 465, 235 N.E.2d 671, 674 (noting that the fact that a certain treatment is customary or usual does not preclude a finding of negligence).

■ The Blood Liability Act reflects this common law understanding of the standard of care as stated in *Darling* and *Chiero*. The Blood Liability Act exempts, *inter alia*, blood banks from strict liability, deeming the collection and distribution of blood a service and not a sale. (745 ILCS 40/2 (West 1992).) The law recognizes the benefits to be derived from scientific knowledge, materials, and skills for using blood and blood products in fostering the public policy to promote the health and welfare of the people of Illinois.[5] The liability of blood banks is limited to cases of negligence or willful misconduct. (745 ILCS 40/1 (West 1992).) They are held to warrant "that [they have] exercised *due care and followed professional standards of care* in providing the service according to the current state of the medical arts." (Emphasis added.) 745 ILCS 40/3 (West 1992).

In the case at bar, the jury was instructed that it was defendant's duty to use "due care for the safety of the plaintiff," and the court defined due care as

> "the care that would be used by reasonably careful blood banks under circumstances similar to those shown by the evidence at and prior to the time Ronaldo Advincula contracted the HIV virus. The law does not say how reasonably careful blood banks would act under the circumstances. That is for you to decide."

The court went on to advise the jury to consider whether defendant complied with its own internal policies and procedures, the knowledge and methods available in February 1984 to educate and screen donors, the practices and procedures of the blood banking industry, and the relevant government regulations and guidelines.

Defendant claims that the trial court violated legislative intent by, in effect, instructing the jury to hold it strictly liable to plaintiff. It contends that it was held to a standard of care defined as both the due care an ordinary person would use and the care defined by professional standards, even if those two standards conflicted. Thus, it

---

[5]As of 1992, every State had enacted a blood shield statute except New Jersey, where courts have established the rule deeming the collection and distribution of blood and blood products a service rather than a sale. (*Legal Issues*, at 821.) However, this limit on the liability of blood banks is not without its critics. At least one commentator endorses reconsidering strict liability for blood banks, in part, because they are in the best position to take cost-effective precautions. Ross D. Eckert, *The Aids Blood-Transfusion Cases: A Legal and Economic Analysis of Liability*, 29 San Diego L. Rev. 203 (1992).

argues, it would be held liable both if it failed to follow existing professional standards and if its conduct exceeded professional standards. Plaintiff responds that defendant was required to exercise the due care that a reasonably prudent blood bank would exercise if professional standards were themselves inadequate.

■ To resolve this dispute, we must construe the meaning of section 3. When interpreting a statute, the function of this court is to ascertain and effectuate legislative intent. (*Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 84, 256 N.E.2d 758, 764.) Legislative intent should be discerned from the statutory language, and, where the language is certain and unambiguous, the court's sole function is to enforce the statute as enacted without reading into it exceptions, conditions, or limitations which conflict with clearly expressed legislative intent. (*Harvey Firemen's Association v. City of Harvey* (1979), 75 Ill. 2d 358, 363, 389 N.E.2d 151, 153.) Each statutory provision should be given some reasonable meaning, if possible; finding surplusage is disfavored. (*Hirschfield v. Barrett* (1968), 40 Ill. 2d 224, 230, 239 N.E.2d 831, 835.) Generally, use of the conjunctive, as in the Blood Liability Act, indicates that the legislature intended for all of the listed requirements to be met. (1A N. Singer, Sutherland on Statutory Construction § 21.14, at 129 (5th ed. 1991).) While disjunctive words (such as ''or'') and conjunctive words (such as ''and'') are sometimes misused by legislators, ''[t]he literal meaning of these terms should be followed unless it renders the statute inoperable or the meaning becomes questionable.'' 1A N. Singer, Sutherland on Statutory Construction § 21.14, at 9 (5th ed. Supp. 1995).

■ The plain meaning of the Blood Liability Act requires our holding that blood banks are mandated both to follow professional standards and to exercise due care, as indicated by the use of the conjunctive in the statute; if professional standards are not sufficient to constitute due care, blood banks are required to take measures beyond those followed by the profession in order to meet the standard of care. Under UBS' proposed interpretation of the statute, the entire industry could be effectively shielded from liability for negligence if the profession's standards were insufficient. See, *e.g.*, *Lundahl*, 93 Ill. App. 2d at 465, 235 N.E.2d at 674; see generally Havighurst, *Altering the Applicable Standard of Care*, 49 Law & Contemp. Probs. 265 (Spring 1986) (advocating a contractual approach to defining the standard of care health care providers owe consumers and noting that the professional custom standard ''creates an almost irrebuttable presumption of due care'').

This conception of the meaning of section 3 is buttressed by the limited legislative history available to us relating to the Blood Li-

ability Act. As already noted, the statute deems the transfer of blood and blood derivatives a service in order to foreclose the imposition of strict liability upon hospitals, physicians, and technicians dealing with blood products. (78th Ill. Gen. Assem., House Proceedings, June 13, 1973, at 67 (statements of Representative Lauer).) By enacting section 3, the legislature was responding to a supreme court case which held a hospital strictly liable for the sale of tainted blood to a patient. (See *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 266 N.E.2d 897.) At the time of the 1973 amendments to the statute, blood, whether donated or sold, could not be tested for hepatitis, and patients receiving transfusions were at risk of contracting the disease. (See 78th Ill. Gen. Assem., House Proceedings, June 13, 1973, at 70 (statements of Representative. Juckett).) There is no indication that the legislature intended for entities dealing in blood and blood products to be immune from liability for negligent conduct. See 78th Ill. Gen. Assem., House Proceedings, June 13, 1973, at 67 ("this does give *** certain protection to the Physicians [*sic*] and to the Hospitals [*sic*] in that they are acting in good faith and exercising due care in the transfer of blood") (statements of Representative Lauer).

Defendant points out that many jurisdictions have held blood banks in similar cases to a standard of care defined by the prevailing custom in the profession. See, *e.g., Spann v. Irwin Memorial Blood Centers of the San Francisco Medical Society, Inc.* (1995), 34 Cal. App. 4th, 644, 653, 40 Cal. Rptr. 2d 360, 364 (blood bank held to a professional standard of care as defined by custom and practice); *Wilson v. Irwin Memorial Blood Bank* (1993), 14 Cal. App. 4th 1315, 1326-27, 18 Cal. Rptr. 2d 517, 524 (same); *Hutchins v. Blood Services* (1973), 161 Mont. 359, 364-65, 506 P.2d 449, 452 (same); *Doe v. American Red Cross Blood Services* (1989), 297 S.C. 430, 435-36, 377 S.E.2d 323, 326 (same); see also Kelly, *The Liability of Blood Banks and Manufacturers of Clotting Products to Recipients of HIV-Infected Blood: A Comparison of the Law and Reaction in the United States, Canada, Great Britain, Ireland, and Australia*, 27 J. Marshall L. Rev. 465, 472 (1994) (hereinafter *The Liability of Blood Banks*) (noting that it is often difficult for plaintiffs in AIDS transfusion cases to prove a breach of duty because most jurisdictions utilize a professional standard of care rather than the reasonable person standard).

However, as plaintiff asserts, other jurisdictions have refused to limit blood banks' liability to instances where they deviate from professional custom or local usage. (See, *e.g., Snyder v. Mekhjian* (1990), 244 N.J. Super. 281, 292-93, 582 A.2d 307, 313 (where HIV-infected blood was transfused in August 1984, summary judgment

was precluded by questions of fact regarding the reasonableness of the defendant blood bank's conduct in collecting and distributing blood without using surrogate testing, regardless of whether it followed AABB guidelines on the matter); *Vuono v. New York Blood Center, Inc.* (D. Mass. 1988), 696 F. Supp. 743, 746 (in a case where contaminated albumin was administered to the plaintiff in May 1983, causing septic shock and herpes simplex, the court noted that evidence of community customs, while admissible and relevant in negligence actions, "is not conclusive evidence of due care because a large number of persons may fail to exercise due care in their usual practices"); see also *Silva v. Southwest Florida Blood Bank, Inc.* (Fla. 1992), 601 So. 2d 1184, 1187-88 (in a case involving transfusions of HIV-infected blood in February 1984 and in 1986, holding that Florida's blood shield statute, which exempted blood banks from liability for defects that could not be detected or removed by "a reasonable use of scientific procedures or techniques," did not bring blood banks within the two-year limitations period for medical malpractice, rather than the four-year period for negligence).) In addition, some jurisdictions that have adopted a professional standard of care nonetheless expressly recognize that a plaintiff may prevail on a negligence claim by showing that the entire industry was negligent. *United Blood Services, a Division of Blood Systems, Inc. v. Quintana* (Colo. 1992), 827 P.2d 509, 523-24 (although blood banks should be held to a professional standard of care, the plaintiff could attempt on remand to show that the blood banking community's standard of care was unreasonably deficient);[6] *Brown v. United Blood Services* (1993), 109 Nev. 758, 766 n.5, 766-67, 858 P.2d 391, 396 n.5, 396-97 (blood bank conformed to the industry-wide standard of care and therefore could not be held liable for failing to adopt three procedures for detecting HIV-infected blood, but the plaintiff could have attempted to show that the industry standards were deficient).

Requiring blood banks to exercise due care and to follow professional standards does not result in potential liability under an ordinary person standard and a professional custom standard, because the focus is on a reasonably prudent blood bank, as reflected in the instructions provided by the trial court in the instant case. As plaintiff points out, Dr. Ernest Simon, UBS' medical director, testified that FDA recommendations and AABB guidelines were minimum standards and that UBS' "own SOP is considerably more

---

[6]The *Quintana* plaintiff prevailed on remand. The defendant appealed again, but the case was settled prior to an adjudication on appeal. *The Liability of Blood Banks*, at 474-75.

detailed than, as we have shown by volume—than either one of those two documents so that's an additional step. So that we can talk about three levels of staircase and, as a licensed establishment, we are committed to all three layers." Thus, UBS itself recognized that the appropriate standard of care may require taking precautions beyond those recommended by government and industry organizations.

UBS finds its situation distinguishable from *Darling* by contending that since its procedures required the professional judgments of medical personnel, the present case is a "medical case." UBS views *Darling* as applying only to administrative decisions of health care institutions; therefore, it asserts, the applicable standard of care should be defined by what "similarly situated professionals (in this case, other blood banks) would have done." It finds support in *Ellig v. Delnor Community Hospital* (1992), 237 Ill. App. 3d 396, 603 N.E.2d 1203. In *Ellig*, we held that the trial court erroneously instructed the jury when it provided an instruction defining the professional negligence of a hospital in terms of ordinary negligence, *i.e.*, what a reasonable layperson would have done in similar circumstances. This court explained that "[t]he standard of care to which a health care provider is held is not the same standard of care to which a layperson is held, unless the negligence is so grossly apparent or obvious that an ordinary layperson could appraise it." *Ellig*, 237 Ill. App. 3d at 412, 603 N.E.2d at 1214.

In the present case, the trial court avoided the error made in *Ellig* when it instructed the jury that UBS was required to act in accordance with how a reasonably prudent blood bank would have conducted itself. Thus, in contrast to *Ellig*, the trial court in the instant case defined due care not in terms of the ordinary person, but rather, in terms of reasonably careful blood banks. See Illinois Pattern Jury Instructions, Civil, No. 105.03.01 (3d ed. 1990).

In sum, we hold that the trial court adopted the correct standard of care under the Blood Liability Act. UBS was required to exercise due care and to follow professional standards; if professional standards did not meet the requirement of due care, UBS was required to exceed those standards.

Affirmed.

JUSTICE DiVITO, specially concurring:

Between the extremes of affirmance and reversal favored by my colleagues, my preference is to remand for application of the two-step approach outlined below. Nevertheless, mindful of the need to resolve the issue and of our certification of the case to the supreme court, I

opt to concur in the judgment of affirmance. I do so because I believe that the opinion's analysis of the Blood Liability Act and its application of case law precedent are defensible. I write separately, however, to suggest that a different standard of care is preferable in cases of this type.

We deal here with a negligence claim based on a blood bank's failure to properly screen blood donors and to properly test donated blood for the causative agent of the AIDS virus. As UBS notes, blood banking is a recognized medical specialty, with its own board certification and professional organizations. Moreover, acquiring, preparing and safeguarding human blood for use in medical transfusion requires the exercise of medical and scientific expertise by health care professionals during both the donor screening and blood testing stages of the process. UBS performed all of its donor screening, blood testing, and other blood banking activities under the direction and supervision of its medical director, who is a physician. Any negligence by UBS in performing those operations occurred only by reason of the action or inaction of its officers and employees functioning as health care professionals.

The Blood Liability Act states that blood banks warrant to have "followed professional standards of care in providing the service according to the current state of the medical arts." (745 ILCS 40/3 (West 1992).) Standing alone, this language creates a standard such as that found in medical malpractice cases. (See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Indeed, there is no direct language in the statute which would indicate anything to the contrary. Thus, there is considerable merit in UBS' argument that the Blood Liability Act was intended to subject blood banks to a professional, medical standard of care.

Nevertheless, UBS' argument that professional standards must be the *sole* criterion for determining the standard of care under the Blood Liability Act must ultimately fail. The Act states that in addition to professional standards, blood banks also warrant to have exercised "due care." As the majority opinion correctly notes, the plain meaning of this language is that blood banks are required both to follow professional standards and to exercise due care. Furthermore, as plaintiff points out, UBS' argument that the standard of care should consist exclusively of professional standards would simply render the term "due care" superfluous, in violation of principles of statutory construction. (*People v. Figures* (1991), 216 Ill. App. 3d 398, 401, 576 N.E.2d 1089, 1092; *Roser v. Anderson* (1991), 222 Ill. App. 3d 1071, 1080, 584 N.E.2d 865, 869.) The plain wording of the statute must govern here; the majority is correct that effect must be given to the term "due care."

In reaching its conclusion here, the majority relies on *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204. There, the defendant hospital argued that its duty of care was to be determined by "the care customarily offered by hospitals generally in its community." (*Darling*, 33 Ill. 2d at 331, 211 N.E.2d at 257.) The supreme court agreed that custom is relevant in determining the standard of care, but determined that it should never be conclusive on the issue.

The majority holds, in applying *Darling*, that professional standards are relevant, but serve as simply one factor in determining a blood bank's liability under a general due care analysis. The majority thus concludes that the jury properly concluded that professional standards were inadequate and that the evidence justified a finding of lack of care. As indicated earlier, I believe this holding is defensible.

I note, however, that in endeavoring to incorporate "due care" and the "professional standards" language into the Blood Liability Act's overall standard of care, the majority states that "if professional standards are not sufficient to constitute due care, blood banks are required to take measures beyond those followed by the profession in order to meet the standard of care" (274 Ill. App. 3d at 581), and that "if professional standards did not meet the requirement of due care, UBS was required to exceed those standards" (274 Ill. App. 3d at 584). By this language, the majority suggests a two-part test: the first part would require an examination of the professional standards of the blood banking industry and a blood bank's adherence to those standards; the second part would require a general due care analysis and would be reached only if the industry standards were found deficient. Thus, meeting professional standards raises a rebuttable presumption that due care has been satisfied; that presumption could be rebutted by showing that the professional standards were deficient.

Although the majority rationale suggests a two-part test, it does not mandate it. Here, the jury was not informed of such a test and it was given no guidance in applying it. For that reason, I would remand the case for retrial under the two-step standard.

I believe that this two-part approach is preferable. It strikes a better balance between the competing concerns of protecting blood banks and, at the same time, ensures that they are held liable for truly negligent behavior. The majority's approach "swallows up" the professional standards language in a general due care analysis. The two-part test, on the other hand, more accurately reflects the equal

footing of the two phrases "due care" and "professional standards of care" found in the Blood Liability Act. A similar two-part approach is used in other jurisdictions. *United Blood Services, a Division of Blood Systems, Inc. v. Quintana* (Colo. 1992), 827 P.2d 509, 523-24; *Brown v. United Blood Services* (1993), 109 Nev. 758, 766 n.5, 766-67, 858 P.2d 391, 396 n.5, 396-97.

JUSTICE McCORMICK,[7] dissenting:

Today, in affirming the trial court's jury instructions on the standard of care imposed by section 3, the majority misapplies the plain language of the statute and fails to implement the apparent intent of the Blood Liability Act, as stated in section 3. This results in a standard of care which, I fear, few professionals can meet. Therefore, I respectfully dissent.

The undisputed evidence in this case showed that UBS was administered by medical personnel and that the same medical personnel developed its policies regarding transfusion of blood and implemented its response to the, in 1984, still new and little understood scourge of AIDS. Only in the months prior to the transfusion resulting in this lawsuit did health officials begin to suspect with any degree of certainty that our nation's blood supply was a pipeline for the causal agent of AIDS (unknown at the time to be HIV, which was yet to be discovered). Indeed, at the CDC's January 1983 meeting, at least two participants voiced the opinion that a blood-borne agent was not the source of AIDS. We may today, with the aid of hindsight, find such opinions hopelessly uninformed. Nonetheless, this is now; that was then. Thus, if we are to assess blame on the entire blood banking industry, which is the basis of the majority's opinion, we ought also to hold responsible the CDC, the FDA and every other organization and agency that participated in UBS's failure.

The trial court instructed the jury that UBS was required to exercise due care in providing its services. The trial court further defined due care as that which a reasonably prudent blood bank would exercise, considering (1) the blood bank's compliance with its own internal policies and procedures; (2) the knowledge and methods available in February 1984 to educate and screen donors; (3) the practices and procedures of the blood banking industry; and (4) the relevant government regulations and guidelines. However, in accor-

---

[7]Justice McCormick participated in the decision in this appeal prior to his retirement from the Appellate Court of Illinois, First District, on August 1, 1995.

dance with section 3, UBS warranted that it had "exercised due care and followed professional standards of care in providing the service according to the current state of the medical arts." (745 ILCS 40/3 (West 1992).) Whether a blood bank followed professional standards of care is not, according to this section, to be considered as merely an element of due care. It is itself a standard of care. Thus, in the first instance, the instruction minimizes the importance of professional standards in evaluating UBS' conduct.

Furthermore, in defining "exercised due care" as requiring UBS to take steps beyond those dictated by professional standards if those standards "are not sufficient to constitute due care" (circular reasoning if ever there was), the trial court, as well as the majority, failed to focus on the most crucial aspect of section 3, which is the phrase, "in providing the service according to the current state of the medical arts." (745 ILCS 40/3 (West 1992).) That phrase modifies both "exercised due care" and "followed professional standards of care." Like the requirement that UBS follow professional standards, it is not a mere element of due care, as prong two of the instruction implies.

I do not profess to know with certainty what the legislature intended with regard to section 3. The legislative history is not nearly so conclusive as the majority would have it. Nonetheless, a plain reading of section 3 indicates that UBS' responsibility to exercise due care and to follow professional practices was cast in terms of what medical science was reasonably able to accomplish in 1984. This necessarily requires that courts defer to the standards of the professional community (which in this case is comprised of medical doctors), as section 3 recognizes. In this case, the trial court and the majority have relegated "professional standards of care," as well as "in providing the service according to the current state of the medical arts," to the status of elements of due care. This is contrary to the plain language of section 3 and permits lay jurors to second-guess the professional judgments of those dedicated to providing a safe blood supply.

It strikes me as sheer arrogance for the legal community, in hindsight, to question the professional judgment of those responding to the AIDS crisis in its early phases. Thus, to discuss, in the first instance, the blood banking industry's early response to the AIDS crisis as adherence to mere "custom" and to suggest that the entire industry was negligent in that it "unduly lagged in the adoption of new and available devices," as was the case in the tugboat industry's failure to adopt the radio receiver (see *The T.J. Hooper* (2d Cir. 1932), 60 F.2d 737, 740), is not only disingenuous, but places doctors in the

category of gods, able to discern and conquer the unknown. Indeed, our supreme court's warning in *Darling* against relying solely on custom to determine the standard of care assumes a custom upon which to rely. Our health industries' early responses to AIDS were not about custom, but about desperation in the face of exponentially increasing morbidity coupled with a lack of reliable scientific data.

We should focus in this case upon just how little we knew of AIDS in early 1984. What the majority sees today, relying on expert testimony aided by over a decade of hindsight, as reasonable responses to the threat to the blood supply were at the time neither so reasonable nor apparent. For instance, contrary to the implication of the majority opinion, although by February 1984 the possibility of surrogate testing of blood was discussed and suggested by some people in the medical community, it was neither recommended nor required by any professional association or regulatory agency. In any event, the majority notes that surrogate testing for hepatitis B is between 66% and 88% accurate in identifying potentially HIV-infected blood. In a worst-case scenario, that would mean that 34 out of 100 donors of blood who were HIV-positive would not have been screened out by surrogate testing. Even a best-case scenario would have resulted in the donation of a significant amount of HIV-positive blood. Dr. Francis acknowledged as much. Altruistic blood donors who honestly answered self-deferment questions might result in the same or better statistics, which is precisely the type of reasoning that the blood banking community was engaged in at the time. Given this, I fail to see the exalting of surrogate testing as having (a) been the panacea to the blood supply crisis, and (b) in hindsight, set the standard of care to which the blood banking industry should be held when no professional association or regulatory agency saw fit to so deem it. As our supreme court has stated in a related context, "medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care." *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 261, 381 N.E.2d 279.

For all of the foregoing reasons, I dissent.