ANNA CARTER, Plaintiff-Appellant, v. WALTER JOHNSON, Defendant-Appellee.

First District (2nd Division)   No. 1—91—1355

Opinion filed May 18, 1993.

Stanley L. Hill & Associates, P.C., of Chicago (Stanley L. Hill, Darlene A. Blaszczak, and Christopher W. Graul, of counsel), for appellant.

Lord, Bissell & Brook, of Chicago (Williams P. Dorr, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On September 23, 1978, plaintiff Anna Carter consulted defendant Walter Johnson, M.D., regarding abnormal menstrual bleeding accompanied by abdominal pain which she had been experiencing for some time. After examination, defendant diagnosed her as suffering from a degenerating fibroid tumor approximately as large as a three-month pregnancy inside her uterus. Defendant decided that the proper treatment was simply to track the development of the tumor.

Defendant saw plaintiff again in April 1979, and in October 1980, and each time he found that the tumor was still growing. Since defendant was fairly certain that the growth was benign, he determined that surgery was not yet indicated. However, when plaintiff visited defendant on February 4, 1982, he recommended that she have a hysterectomy because the tumor had grown to a size approximating that of a five-month-old fetus.

On February 22, 1982, plaintiff was admitted to the University of Chicago's Lying-In-Hospital, where defendant had surgical privileges. She was prepared for surgery that night, and the next morning defendant, assisted by a resident, Dr. Mitchell, performed the hysterectomy. Defendant's post-operative notes indicated that the 1-hour-and-45-minute operation was routine and that no complications had developed.

After plaintiff regained consciousness on the day of the surgery, she was experiencing some pain and running a low-grade fever of 38 degrees celcius (100.4 degrees fahrenheit). Although the fever persisted for the next couple of days, it was not until February 27 that an infection was suspected, and she was given antibiotics in an effort to combat it.

On March 2, defendant left for a planned vacation, leaving plaintiff in the primary care of Dr. Jones, another physician at the hospital. At about 4:30 p.m. that day, a resident noticed a foul-smelling discharge emanating from plaintiff's vagina.[1] After examination, it was determined that her vagina contained bowel contents which most likely were the cause of her infection and fever. On March 3, a large amount of foul-smelling drainage, which later proved to be bowel contents as well, was also discovered at the incision site. The incision was thus reopened and cleaned with hydrogen peroxide.

It was determined soon thereafter that plaintiff had a fistula (tract) between her rectum and her vagina which was funneling bowel contents out of her rectum and into her vagina. Consequently, a bowel surgeon, A.R. Moosa, M.D., was consulted, and plaintiff was transferred to Billings Memorial Hospital. Dr. Moosa's prognosis was that surgery was necessary to repair the hole in the bowel wall, but first he had to wait until the wound which had been reopened healed sufficiently. When Dr. Moosa performed the necessary reparative operation on April 12, he discovered that there were two fistulae, one between the rectum and the vagina, and one between the sigmoid colon and the vagina. He repaired the holes, but since the wounds had to be allowed to heal, he preformed a temporary diverting colostomy in order to reroute bowel contents to prevent them from reaching the colon.

---

[1] The evidence also established that plaintiff earlier had complained to a nurse of a small vaginal discharge on February 28.

Plaintiff was released from the hospital on April 25, 1982, and was readmitted for 11 days in October 1982 to have the colostomy bag removed. Additionally, she was hospitalized on four occasions between July 1982 and December 1989 to clear small bowel obstructions.

On December 2, 1986, plaintiff filed a three-count complaint against defendant, alleging specific negligence in count I, *res ipsa loquitur* in count II, and failure to obtain informed consent in count III. Plaintiff ultimately dismissed count III of the complaint, and the case went on to be tried before a jury beginning in November 1990.

Defendant testified first for plaintiff as an adverse witness. He admitted that he was the surgeon in charge of the operation and that it was his responsibility throughout the entire procedure. He also admitted that the fistulae and the infections which plaintiff sustained after the surgery were the direct result of the hysterectomy which he performed, and that obviously had the surgery proceeded "smooth as usual," plaintiff would not have suffered the aftereffects described above.

Defendant reaffirmed what he had noted in the post-operative report, namely, that there were no major complications during the surgery, that he noticed no visible adhesions (scar tissue) during the operation, and that plaintiff tolerated the procedure well. Defendant also stated, however, that there was "an abnormal attachment, possibly due to some previous infection," between her uterus and her sigmoid colon.

Defendant hypothesized that there were several possibly negligent ways in which the fistulae could have been caused. First, fistulae will form if the tissue wall of the bowel or the sigmoid colon is damaged by the unskilled use of a scalpel, scissors, or clamp, all of which he utilized. He denied, however, that either he or Dr. Mitchell damaged plaintiff's bowel wall in such a fashion during the surgery. Defendant also opined that a fistula could result if a surgeon placed an errant stitch in the bowel wall, as bowel contents would then run along the thread into the vaginal area, causing the tissue around the thread to become infected and ultimately to collapse, thus causing a larger schism. He denied, however, that he stitched the wall between plaintiff's rectum and the vagina.

Dr. Moosa, called by plaintiff, testified next through the medium of a videotaped deposition. He stated that plaintiff's complications, primarily the resulting fistulae, were unquestionably a direct result of her hysterectomy. He further stated that while such complica-

tions are rare and that a hysterectomy generally can be performed safely, the organs adjacent to the uterus occasionally can be damaged during surgery without negligent conduct. He testified, however, that it was impossible to determine which of the many possible causes actually occasioned plaintiff's injuries.

Plaintiff's expert witness, Julian Ullman, M.D., who is board-certified in obstetrics and gynecology, next took the stand and testified that plaintiff's fistulae were a direct result of the hysterectomy performed by defendant. He stated that in his opinion, to a reasonable degree of medical certainty, defendant deviated from the applicable standard of care in causing those complications to occur, because fistulae should not result from a routine hysterectomy, which was how the post-operative report characterized the instant procedure. He also testified that there was no evidence in the post-operative notes of adhesions or any other mitigating factors which could have caused defendant any problems during the procedure; in any event, Dr. Ullman opined, a skilled surgeon would instantly see such adhesions and deal with them accordingly. He concluded that the fistulae were possibly caused by the careless use of a clamp, scalpel, scissors, or suture, any of which would be an obvious breach of the standard of care.

David Zbaraz, M.D., a board-certified obstetrician-gynecologist and associate professor at Northwestern University, testified as an expert witness on behalf of defendant. After first noting that plaintiff was treated for pelvic inflammatory disease (PID) in 1978, he stated that one common side effect of that disease is adhesions which form in the pelvic region. He explained that adhesions are commonly formed by the fibroid tumor in the uterus itself; as the tumor grows, it inflames the entire region, thus causing scar tissue. Dr. Zbaraz testified that it was very possible that, as the uterus enlarged, it displaced the rectum, forming adhesions connecting the back of the uterus to the bowel wall. He further opined that given the location and diminutiveness of those adhesions, it would be almost impossible for the surgeon to see them until he had separated the uterus from the bowel wall. Additionally, if pulling the adhesions did not cause a perforation or any bleeding, the surgeon would not see them at all, and they would not cause complications until the bowel wall ruptured several days or a week later.

Dr. Zbaraz opined that the foregoing set of circumstances was the most likely cause of the fistulae, because, in his opinion, to a reasonable degree of medical certainty, the fistulae did not form until several days after surgery, and he felt that if the wall of the

bowel or sigmoid colon had been damaged with a scalpel or another surgical instrument, fecal material would have been discovered in the vaginal area almost immediately. Accordingly, he opined to a degree of medical certainty, plaintiff's fistulae formation was not the result of defendant's negligence, but was instead a possible, albeit uncommon, complication of a hysterectomy.

Plaintiff moved for a directed verdict on the *res ipsa loquitur* count, and defendant moved for a directed verdict on both counts. The trial court denied both motions and instructed the jury only on count I (specific negligence) for the reason that plaintiff did not tender any instructions on the *res ipsa loquitur* count.[2] The jury returned a verdict for the defendant, and the court denied plaintiff's motion for judgment *non obstante verdicto* and/or a new trial.

Plaintiff now appeals, raising only the question of defendant's negligence during the hysterectomy.

## I

Plaintiff first assigns as error the trial court's denial of her objection to Dr. Zbaraz's testimony wherein he opined that plaintiff's fistulae may have been caused by the tearing of minute and obstructed adhesions which defendant could not have seen while performing the surgery. She asserts that since defendant testified that he observed no adhesions during the operation, and no other evidence in the record suggests that she had adhesions, Dr. Zbaraz's testimony was unduly speculative and thus should have been excluded. We disagree.

Although it is true that an expert witness may not guess, surmise or conjecture as to a possible cause for an injury based on matters which are not based on the evidence (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 244, 500 N.E.2d 8, 13; *Baird v. Adeli*

---

[2]The relevant instruction offered to the jury states as follows:

"The plaintiff claims that she was injured and sustained damage, and that the defendant was negligent in one or more of the following respects:

1. applied clamp(s) and or used scalpel or used scissors or placed sutures in such a manner as to cause retrovaginal and sigmoid colon vaginal injuries while performing plaintiff's hysterectomy.

2. damaged the sigmoid colon and rectum and failed to inspect, recognize and repair these injuries while performing plaintiff's hysterectomy.

3. caused devascularization damage to the tissues and failed to inspect, recognize and repair these injuries while performing plaintiff's hysterectomy.

4. failed to diagnose a post-operative infection in a timely manner.

5. failed to properly supervise plaintiff's post-operative treatment."

(1991), 214 Ill. App. 3d 47, 65, 573 N.E.2d 279, 290, *appeal denied* (1991), 141 Ill. 2d 536, 580 N.E.2d 108), the testimony of a medical expert need not be based on absolute certainty, but only upon a reasonable degree of medical and scientific certainty. (*Dabros v. Wang* (1993), 243 Ill. App. 3d 259, 265; *Hunter v. Chicago & North Western Transportation Co.* (1990), 200 Ill. App. 3d 458, 473, 558 N.E.2d 216, 226; *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 419, 458 N.E.2d 530, 538.) Furthermore, an expert witness may properly testify in terms of probabilities and possibilities based on facts assumed from the evidence. (*Rodrian v. Seiber* (1990), 194 Ill. App. 3d 504, 507, 551 N.E.2d 772, 774.) Our supreme court has explained:

> "A physician as an expert witness is called upon to assume the facts, taken from the evidence, as true and to give an opinion on such facts. He may testify to 'what might' have caused a death or injury, despite any objection that his testimony is inconclusive and speculative. The testimony is but the opinion of the witness given on facts assumed to be true. It is for the trier of fact to determine the facts." *Beloit Foundry v. Industrial Comm'n* (1976), 62 Ill. 2d 535, 539, 343 N.E.2d 504, 506.

Accord *Norman v. American National Fire Insurance Co.* (1990), 198 Ill. App. 3d 269, 299, 535 N.E.2d 1087, 1095.

Furthermore, with respect to the amount of evidence necessary to support an expert's opinion, our supreme court has stated that where an expert is asked a hypothetical question based on certain assumptions, "[a]s long as the hypothetical assumptions are within the realm of circumstantial or direct evidence, as supported by the facts or reasonable inferences, the question is permissible." (*Guardian Electric Manufacturing Co. v. Industrial Comm'n* (1973), 53 Ill. 2d 530, 535, 293 N.E.2d 590, 594.) Moreover, the facts suggested in hypothetical questions need not be undisputed but only supported by the record (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 771, 451 N.E.2d 262, 267), and "[i]n presenting evidence by a hypothetical question, counsel propounding the question has a right to ask it, assuming only the facts as he perceives them to be shown by the evidence" (*Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 180, 399 N.E.2d 606, 611); opposing counsel may then challenge the controverted facts by presenting his own hypothetical questions to the witness on cross-examination. (*Hebeler v. Industrial Comm'n* (1991), 207 Ill. App. 3d 391, 395, 565 N.E.2d 1035, 1037.) Finally, the admissibility of expert testimony is left to

the sound discretion of the trial court, and its determination will not be disturbed absent an abuse thereof. *Carlson v. City Construction Co.* (1992), 239 Ill. App. 3d 211, 239, 606 N.E.2d 400, 417, *appeal denied* (1993), 148 Ill. 2d 640.

■ We find that there was sufficient evidence in the record to support Dr. Zbaraz's opinion that plaintiff had tiny adhesions in her abdominal area which were the likely cause of plaintiff's injuries. First, defendant testified that there was "an abnormal attachment" between plaintiff's uterus and sigmoid colon, and Dr. Zbaraz could have reasonably inferred that those "attachments" were in fact adhesions. Second, plaintiff's medical history indicated that she was suspected of having PID, a condition known to cause adhesions. Finally, the fact that fecal material was not discovered in plaintiff's vagina and incision site until several days after the operation, indicating that her bowel was functioning properly, was evidence that adhesions, and not a misplaced suture or clamp, caused a slow erosion of plaintiff's bowel wall.

Plaintiff nevertheless repeatedly asserts that Dr. Zbaraz's opinion testimony cannot be admissible because defendant admitted that his post-operative report does not indicate that he encountered any adhesions during surgery. She fails to apprehend, however, that Dr. Zbaraz testified that the adhesions could have been so small and so obstructed by the uterus that defendant could not have perceived them while he was performing the operation. Although plaintiff obviously believes that Dr. Zbaraz's "adhesion theory" is specious, it was still a question of credibility—a matter for her to address during cross-examination and closing argument.

The facts in the case on which plaintiff relies heavily, *Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638, *appeal denied* (1988), 119 Ill. 2d 554, 522 N.E.2d 1242, are easily distinguishable from the facts *sub judice*. In *Coffey*, the evidence presented by the plaintiff, including an admission by the defendant doctor, showed that she was injured during an abdominal hysterectomy because the defendant placed a suture in the wrong place which blocked her urinary tract. (*Coffey*, 165 Ill. App. 3d at 18-19, 518 N.E.2d at 640.) The defendant presented an expert who opined that the plaintiff's injury may have been caused not by the misplaced stitch, but instead by an inflammatory process which may have thickened the peritoneum of her ureter, thus lessening that organ's pliability. (*Coffey*, 165 Ill. App. 3d at 19, 518 N.E.2d at 641.) We held that the defense expert's testimony should have been excluded because there was nothing in the record reflecting that the plaintiff had a thicken-

ing of the peritoneum, especially since the post-operative report was silent regarding such a condition. *Coffey*, 165 Ill. App. 3d at 25, 518 N.E.2d at 644-45.

The difference between the factual situation here and the one presented in *Coffey* is that here, as stated above, Dr. Zbaraz testified that if his theory of what happened is taken as true, defendant could not have noticed the adhesions while operating on plaintiff; thus, the fact that no mention is made of adhesions in defendant's post-operative report is perfectly consistent with Dr. Zbaraz's theory. In *Coffey*, however, the defense expert did not state or imply that defendant would not have observed a thickening of the peritoneum had it existed and been a factor in the operation; consequently, the lack of such a notation in his post-operative report was totally inconsistent with the presence of that thickening during surgery. Accordingly, the decision in *Coffey* does not require us to reverse the judgment in this case.

■ Plaintiff's final argument as to Dr. Zbaraz's testimony is that it should have been excluded because it was contrary to defendant's judicial admission that plaintiff had no adhesions in her abdominal area at the time of the surgery. (See *Lowe v. Kang* (1988), 167 Ill. App. 3d 772, 776, 521 N.E.2d 1245.) Plaintiff's argument misses the mark. We repeat, at the risk of seeming to be didactic: defendant did not testify that plaintiff did not have any adhesions; he stated that he did not *observe* any during the procedure. This is entirely consistent with Dr. Zbaraz's testimony that there may have been adhesions which caused plaintiff's injuries which defendant could not have seen during the operation. Thus, defendant made no judicial admission which rendered the defense expert's testimony inadmissible.

Accordingly, we hold that the trial court did not abuse its discretion in permitting Dr. Zabraz to opine that plaintiff's injuries were most probably caused by the tearing of small adhesions.

## II

Defendant next contends that the trial court erred in denying her post-trial motion for a judgment *n.o.v* or, in the alternative, for a new trial. It is well established that a trial court should enter a judgment *n.o.v.* only if all of the evidence, viewed in. the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could stand (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14), and that standard also governs a reviewing court's

consideration of a trial court's denial of a judgment *n.o.v. Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 569, 585 N.E.2d 243, 247, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 629.

Our supreme court also emphasized in *Pedrick* that a different standard of review is applied to a motion for a new trial. (*Pedrick*, 37 Ill. 2d at 509-10, 229 N.E.2d at 513; accord *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 35-36.) A court should set aside a jury verdict and grant a new trial only where the verdict is contrary to the manifest weight of the evidence. (*Pedrick*, 37 Ill. 2d at 509, 229 N.E.2d at 513; *Mizowek*, 64 Ill. 2d at 310, 356 N.E.2d at 36.) A verdict will be deemed to be against the manifest weight of the evidence only if it is palpably erroneous and wholly unwarranted, clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based on the evidence. *Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1050, 532 N.E.2d 1091, 1101, *rev'd on other grounds* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.

We recently had occasion to summarize the nature of our review when faced with a request to set aside a jury verdict in a medical malpractice case:

> "[T]he well-established principle [is] that where conflicting expert testimony is introduced at trial, it is the province of the jury as the trier of fact to resolve the conflict. [Citations.] Although this court is required to scrutinize the evidence in a medical malpractice action when reviewing a *** motion for a judgment *n.o.v.* or a new trial [citations], we will not sit as a second jury and reweigh the evidence or reevaluate the credibility of the witnesses. [Citations.]" *Dabros*, 243 Ill. App. 3d at 264.

■ The case at bar presents a classic example of what has become by this time the ubiquitous "battle of the experts." (See *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 991, 479 N.E.2d 1000, 1006.) After defendant testified to his actions during and after the hysterectomy, plaintiff called an expert witness to explain to a reasonable degree of medical certainty why he felt that defendant's conduct deviated from the standard of care. Defendant then presented his medical expert, who opined to the same degree of certainty why defendant's performance during and after the operation did not amount to breach of the standard of care. The jury heard all of this testimony as well as argument of counsel and resolved the conflict in favor of defendant; we therefore find no discernible reason to disturb that resolution and set aside the verdict.

## III

Plaintiff's third assignment of error is that the trial court erred in failing to grant a directed verdict in her favor on the *res ipsa loquitur* count of her complaint.

Our supreme court expounded on the nature of the *res ipsa loquitur* doctrine in *Imig v. Beck* (1986), 115 Ill. 2d 18, 503 N.E.2d 324, where it explained:

"*[R]es ipsa loquitur* *** raises an *inference* of negligence from otherwise inexplicable facts and circumstances by allowing proof of general negligence through circumstantial evidence. [Citations.] To raise the factual inference of negligence, the plaintiff must demonstrate (1) that the agency or instrumentality causing personal injury or property damage was, at the time of the creation of the condition causing the injury or damage, under the management or control of the party charged with negligence and (2) that the accident occurred under such circumstances that in the ordinary course of events it would not have occurred if the party so charged had used proper care while the agency or instrumentality was under its management or control. [Citations.] When both elements are shown, 'the [occurrence] itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care.' [Citation.]

The application of the doctrine in a given case is a question of law which must be decided in the first instance by the trial court. [Citations.] Once that decision is made, it becomes the function of the trier of fact to weigh the strength of the inference of general negligence. [Citation.] The inference may be strong, requiring substantial proof to overcome it, or it may be weak, requiring little or no evidence to refute it. The weight or strength of such inference will necessarily depend on the particular facts and circumstances of each case and is normally a question of fact to be determined by the jury. [Citations.]

The use of *res ipsa loquitur*, however, does not relieve the plaintiff of the burden of proving negligence by a preponderance of the evidence. That burden of proof never shifts to the defendant, except in the very limited sense that if the defendant offers no evidence to overcome the *prima facie* case made by plaintiff in reliance on the doctrine, he runs the risk that the jury may find against him. [Citations.] More-

over, this inference of negligence does not vanish or disappear entirely upon introduction of contrary evidence by the defendant. The defendant's direct evidence will be considered with all of the other evidence in the case, including the inference drawn from the circumstances of the occurrence. [Citations.]" (Emphasis in original.) *Imig*, 115 Ill. 2d at 26-28, 503 N.E.2d at 328-29.

■ We find that the trial court properly denied plaintiff's motion for a directed verdict on the issue of *res ipsa loquitur*. In determining whether to grant a directed verdict, the trial court is to apply the *Pedrick* standard, *i.e.*, only when the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict could ever stand. *Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.

As stated in *Imig*, *res ipsa loquitur*, when properly established, raises a *permissive*, not a mandatory, inference that plaintiff's injury arose from defendant's negligent conduct. (*Imig*, 115 Ill. 2d at 28-29, 503 N.E.2d at 329.) Accordingly, "in most cases [where *res ipsa loquitur* is applicable] a directed verdict for the plaintiff will not be appropriate, even where the defendant presents no explanation or rebuttal, because it must be left to the jury whether to draw the inference of negligence from the circumstances of the occurrence." (*Imig*, 115 Ill. 2d at 29, 503 N.E.2d at 329.)[3] In the case at bar, we find that the court properly denied plaintiff's motion for a directed verdict because defendant presented evidence which, when looked at in the aspect most favorable to him, established that he did not breach the applicable standard of care when he performed the hysterectomy on plaintiff. As discussed previously, Dr. Zbaraz hypothesized that it was most probable that defendant could not have avoided tearing invisible minute adhesions from parts of plaintiff's bowel wall, causing it to deteriorate over a period of a few days. In light of this evidence, we hold that the trial court properly denied plaintiff's motion for a directed verdict.

## IV

Finally, plaintiff asserts that the trial court erred in failing to

---

[3]The court did note that a directed verdict for the plaintiff might be appropriate in some extremely unusual cases, such as "the human toe in the plug of chewing tobacco, the collision of railway trains trying to run on the same track, and perhaps a rear end collision with a stationary vehicle." *Imig*, 115 Ill. 2d at 29, 503 N.E.2d at 329-30.

instruct the jury on the doctrine of *res ipsa loquitur*. Defendant responds that she has waived the right to such an instruction by neglecting to tender an instruction on that issue to the trial court. (134 Ill. 2d R. 366(b)(2)(i) ("No party may raise on appeal the failure to give an instruction unless he shall have tendered it"); *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 549, 475 N.E.2d 817, 821 ("A plaintiff cannot take the position on appeal that a case should have been presented to the jury with different instructions than those which were given unless at trial he tendered instructions which set forth the statement of the law he contends, on appeal, would have been the proper one").) Plaintiff admits that she failed to tender a *res ipsa loquitur* instruction to the court; however, she argues that since the court denied her motion for a directed verdict on that issue, there was no need to tender an instruction because the court had already ruled, as required by section 2—1113 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1113),[4] that the doctrine was inapplicable.

■ Plaintiff's argument is misplaced. While she is correct that the question of whether *res ipsa loquitur* is applicable in a particular case is initially a question of law for the court to decide (Ill. Rev. Stat. 1989, ch. 110, par. 2—1113; *Imig*, 115 Ill. 2d at 27, 503 N.E.2d at 329), the fact that the court denied her motion for a directed verdict on that issue cannot in any sense be equated with a finding that the doctrine of *res ipsa loquitur* was altogether inapplicable to the case. Obviously, the denial of plaintiff's directed verdict motion meant simply that she was not entitled to a judgment in her favor as a matter of law on the *res ipsa loquitur* count; it certainly did not mean that the court had found that the doctrine

---

[4]Section 2—1113 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1113) provides:

"In all cases of alleged medical or dental malpractice, where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether that doctrine applies. In making that determination, the court shall rely upon either the common knowledge of laymen, if it determines that to be adequate, or upon expert medical testimony, that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected or untoward medical result which ordinarily does not occur in the absence of negligence will suffice in the application of the doctrine."

was inapplicable and was not to be submitted to the jury.[5] Accordingly, plaintiff's subsequent failure to tender an instruction on that count removed from the jury the question of whether she had established the elements of the doctrine such that the court would have been required to submit to the jury both the permissive inference of negligence and the contrary evidence offered by defendant. (*Imig*, 115 Ill. 2d at 26-27, 503 N.E.2d at 328-29.) Accordingly, we find that plaintiff waived her right to have the jury instructed on the *res ipsa loquitur* count.

For all of the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

HARTMAN and DiVITO, JJ., concur.

---

[5]Although it may be possible, as plaintiff urges, that when the court denied her motion for a directed verdict, it also stated that the doctrine was not applicable at all and therefore would not submit that issue to the jury, the argument which took place regarding the directed verdict motions made by both parties was not made part of the record; therefore, we must presume that the court simply denied both parties' motions for a directed verdict for proper reasons. *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958.