NO. 5-92-0628

                                    THE

                        APPELLATE COURT OF ILLINOIS

                              FIFTH DISTRICT

_________________________________________________________________

SUSAN GRANBERRY, by her Mother and   )  Appeal from the

Next Friend, CAROL GRANBERRY; and    )  Circuit Court of 

CAROL GRANBERRY, Individually,       )  Jackson County.  

                                     )

     Plaintiffs-Appellants,          )

v.                                   )  No. 84-L-55

                                     )  

CARBONDALE CLINIC, S.C., a           )  

Corporation; JOSEPH C. TSUNG, M.D.;  )

and URDUJA PULIDO, M.D.,             )  Honorable

                                     )  George Oros, 

     Defendants-Appellees.           )  Judge, presiding.  

_________________________________________________________________

     JUSTICE MAAG delivered the opinion of the court:  

     Plaintiffs, Susan Granberry, by her mother and next friend,

Carol Granberry, and Carol Granberry, individually, filed an eight-

count complaint on May 4, 1984, in the circuit court of Jackson

County alleging medical malpractice against defendants, Carbondale

Clinic, Joseph C. Tsung, M.D., William R. Hamilton, M.D., and

Sidney G. Smith, M.D.  More specifically, the complaint alleged,

inter alia, that because defendants were negligent in treating

Carol's preeclampsia, she delivered a premature child that suffered

from respiratory distress syndrome, hyperbilirubinemia, birth

trauma, hyponatremia, hypocalcemia, cerebral palsy, and spastic

quadriparesis.  On June 26, 1985, plaintiffs amended their

complaint, adding Dr. Urduja Pulido as an additional defendant.

     Susan's cerebral palsy was caused by a brain lesion known as

periventricular leukomalacia.  Periventricular leukomalacia is a

destruction of the white matter next to and above the brain

ventricles.  Due to plaintiffs' main theory of malpractice being

that Susan's brain lesion would not have developed but for the

negligent failure to deliver Susan as soon as Carol developed

severe preeclampsia, plaintiffs needed to establish that Susan's

brain lesion developed in utero as a result of Carol's severe

preeclampsia. 

     The trial lasted nearly four months, with the jury returning

a verdict in favor of defendants.  Plaintiffs' posttrial motion was

denied, and a timely notice of appeal was filed.

     Plaintiffs claim that the trial court erred in refusing to

allow them to ask Dr. Allan Bennett, a treating obstetrician, a

hypothetical question designed to elicit a conditional admission of

liability merely because Dr. Bennett did not agree with the

condition.

     The relevant facts are as follows.  Dr. Roger Klam, an

obstetrician and gynecologist, testified on June 15, 1989.  Dr.

Klam was the attending obstetrician at the time of Susan's birth

due to the fact that he was the doctor on call on May 24, 1982. 

Dr. Klam stated that the fetal heart monitor tracings at the time

of Carol's labor "looked perfectly normal."   Over the course of

several pages of transcript, Dr. Klam agreed that Carol had

heartburn complaints consistent with epigastric pain; elevated

liver enzymes on May 17, 1982, and May 24, 1982; 160 systolic on

two or more occasions while at bed rest six hours apart; three-plus

edema; and two-plus persistent proteinuria for two weeks.  He

agreed that these symptoms "can be indicative of severe pre-

eclampsia and according to `Williams,' they are."  Plaintiffs'

counsel listed the aforementioned symptoms and the sentence in

quotation marks on Plaintiffs' Exhibit No. 98.  It appears from a

review of the record that at this point in Dr. Klam's testimony,

Plaintiffs' Exhibit No. 98 read as follows:  

     "Carol Granberry

     She had:

     1.   Heartburn complaints consistent with epigastric

          pain[.]

     2.   She had markedly elevated liver enzymes on 5-17-82

          and 5-24-82[.]

     3.   She had 160 systolic on 2 or more occasions while

          at bedrest 6 hours apart[.]

     4.   She had 3+ edema.

     5.   2+ persistent proteinuria for 2 weeks.

These can be indicative of severe pre-eclampsia and according to

`Williams['] they are[.]

     Per Dr. Klam--6-15-89[.]" 

Approximately 60 pages later, plaintiffs' counsel asked Dr. Klam if

Carol suffered from three-plus brisk reflexes during the course of

her pregnancy while she was hospitalized.  Dr. Klam stated that he

remembered seeing it one time.  Then, the following colloquy

between plaintiffs' counsel and Dr. Klam occurred:  

     "Q.  [by plaintiffs' counsel]  *** [B]risk reflexes ***

          is [sic] another indication of severe preeclampsia,

          isn't it, sir?

     A.   [by Dr. Klam] It's a warning sign.  ***  It can be. 

          It's one thing that--it might."  (Emphasis added.)

     Plaintiffs' counsel then completed Plaintiffs' Exhibit No. 98,

and in its entirety, it reads as follows: 

     "Carol Granberry

     She had:

     1.   Heartburn complaints consistent with epigastric

          pain[.]

     2.   She had markedly elevated liver enzymes on 5-17-82

          and 5-24-82[.]

     3.   She had 160 systolic on 2 or more occasions while

          at bedrest 6 hours apart[.]

     4.   She had 3+ edema.

     5.   2+ persistent proteinuria for 2 weeks.

     6.   3+ brisk reflexes

These can be indicative of severe pre-eclampsia and according to

`Williams,['] they are[.]

     Per Dr. Klam--6-15-89[.]"  

Written on the side of Exhibit No. 98 is the following:

     "7.  Sudden or excessive weight gain--9 pounds[.]"

After carefully reviewing the record, it is clear that Plaintiffs'

Exhibit No. 98 was prepared by plaintiffs' counsel over a period of

time during Dr. Klam's cross-examination. 

     Dr. Bennett testified on June 16, 1989.  Dr. Bennett is

affiliated predominately with defendant Carbondale Clinic. 

Although Carol's primary attending physician during the majority of

her pregnancy was Dr. Joseph Tsung, Dr. Bennett acted as Carol's

primary attending physician during her hospitalization in May of

1982 because Dr. Tsung was on vacation at that time.

     The hypothetical question at issue and the testimony leading

up to the hypothetical question were as follows:

     "Q.  [by plaintiffs' counsel]  Now, Doctor, have I cor-

          rectly stated your opinion:  `Hyperactive reflexes

          [also known as "brisk" reflexes] or hyperreflexia

          are not indications of a worsening case of pre-

          eclampsia unless accompanied by clonus, twitching,

          or seizures'?"

     A.   [Dr. Bennett]  Yes, sir.

                                   * * *

     Q.   Now, so that we make it clear, those were your

          views, your opinions and medical views that you

          acted upon and used and relied upon in observing

          Carol Granberry and in prescribing treatment or

          care for her during the time she was under your

          care.  Isn't that correct, sir?  

     A.   That is, yes.

     Q.   And, Doctor, if it develops that the fact is that

          hyperactive reflexes or hyperreflexia are, indeed,

          indications of a worsening case of preeclampsia,

          then would it be fair to say, sir, that you did not

          adequately evaluate and care for Carol Granberry

          during the time she was under your care?"  (Empha-

          sis added.)

Defense counsel objected, and the court sustained the objection.  

Plaintiffs claim that the trial court erred in refusing to allow

them to ask Dr. Bennett the aforementioned question.  

     Defendants claim that the hypothetical question suggests that

plaintiffs' counsel was referring to evidence that would subse-

quently be introduced at trial.  The practice of permitting an

expert witness to answer a hypothetical question based upon facts

that have not been previously adduced into evidence, regardless of

whether there is a guarantee that such facts will subsequently be

produced, was said to be "not desirable" and "strongly to be

discouraged."  Jamison v. Lambke, 21 Ill. App. 3d 629, 636, 316

N.E.2d 93, 98 (1974).  Further, whether such practice will be

permitted is within the sound discretion of the trial court. 

Gibson v. Healy Brothers & Co., 109 Ill. App. 2d 342, 353, 248

N.E.2d 771, 776 (1969).  If evidence is admitted upon an assurance

that it will later be connected up, it should be excluded upon the

failure to establish the connection.  Leonardi v. Loyola Universi-

ty, 168 Ill. 2d 83, 96, 658 N.E.2d 450, 457 (1995).  Plaintiffs

claim, however, that Dr. Roger Klam had already testified to the

alleged facts or opinions hypothesized.

     It was formerly the rule in Illinois that an expert witness

could only be asked whether the facts stated in the hypothetical

question are "sufficient", from a medical or surgical point of

view, to cause and bring about a certain condition or malady, or he

may be asked whether a given condition or malady of a person "may"

or "could" result from and be caused by the facts stated in the

hypothetical question.  Fellows-Kimbrough v. Chicago City Ry. Co.,

272 Ill. 71, 77, 111 N.E. 499, 502 (1916).  The Fellows-Kimbrough

court determined, however, that the physician should not be asked

whether or not such facts "did cause" and bring about such

condition or malady.  Fellows-Kimbrough, 272 Ill. at 77, 111 N.E.

at 502.  In 1960, the Illinois Supreme Court changed this rule, and

since that time, counsel may also ask whether the condition "did

cause" the particular result, as long as the witness is not called

upon to decide any controverted fact but is asked to assume the

truth of the facts testified to.  It is therefore proper to phrase

the hypothetical in either form. Clifford-Jacobs Forging Co. v.

Industrial Comm'n, 19 Ill. 2d 236, 243, 166 N.E.2d 582, 587 (1960).

     The assumptions in a hypothetical are proper as long as they

are within the realm of direct or circumstantial evidence or are

reasonable inferences from the established facts.  Guardian

Electric Manufacturing Co. v. Industrial Comm'n, 53 Ill. 2d 530,

535, 293 N.E.2d 590, 594 (1973).  Moreover, the facts suggested in

hypothetical questions need not be undisputed but need only be

supported by the record, and "[i]n presenting evidence by a

hypothetical question, counsel propounding the question has a right

to ask it, assuming only the facts as he perceives them to be shown

by the evidence."  Carter v. Johnson, 247 Ill. App. 3d 291, 297,

617 N.E.2d 260, 265 (1993).  Opposing counsel may then challenge

the controverted facts by presenting his own hypothetical questions

to the witness.  Carter, 247 Ill. App. 3d at 297, 617 N.E.2d at

265.  "Facts, data, or opinions supported by the evidence *** may

be varied in questions asked on cross-examination designed to

develop a potentially different opinion of the expert than would

prevail if the trier believed a contrary version of disputed

facts."  (Emphasis added.)  Graham, Cleary & Graham's Handbook of

Illinois Evidence, §705.2 at 554 (5th ed. 1990).  

     Defendants argue that it is improper to ask a witness to

assume a fact in a hypothetical that the witness does not believe

to be true.  No Illinois case is cited in support.  The case of

Baker v. Gordon, 759 S.W.2d 87 (Mo. Ct. App. 1988), is relied upon. 

We express no opinion of whether Baker accurately states Missouri

law.  It does not accurately state Illinois law.  Illinois law may

be found in the most recent pronouncement of our supreme court:

"Counsel has a right to ask an expert witness a hypothetical

question that assumes facts that counsel perceives to be shown by

the evidence.  [Citation.]  The assumptions contained in the

hypothetical question must be based on direct or circumstantial

evidence, or reasonable inferences therefrom.  [Citation.]  The

hypothetical question should incorporate only the elements favoring

his or her theory, and should state facts that the interrogating

party claims have been proved and for which there is support in the

evidence.  On cross-examination, the opposing party may substitute

in the hypothetical those facts in evidence that conform with the

opposing party's theory of the case."  Leonardi v. Loyola Universi-

ty of Chicago, 168 Ill. 2d 83, 96, 658 N.E.2d 450, 456-57 (1995).

     We find that there was sufficient evidence in the record to

support asking Dr. Bennett the aforementioned hypothetical

question.  First, Dr. Klam testified that brisk reflexes can be an

indication of severe preeclampsia.  Second, Dr. Klam stated that

brisk reflexes might be an indication of severe preeclampsia. 

Finally, Dr. Klam testified that brisk reflexes are a warning sign

of severe preeclampsia.  Hence, plaintiffs' hypothetical question

was framed properly, having relied on the inferences from Dr.

Klam's testimony.  That being the case, Dr. Klam's actual testimony

did include the necessary facts to support plaintiffs' counsel

asking Dr. Bennett the above-mentioned hypothetical question.

     Because the circuit court denied plaintiffs' counsel the

opportunity to ask Dr. Bennett the hypothetical question, a

question supported by the evidence already admitted, it abused its

discretion.  The evidence and inferences to be drawn from the

evidence were sufficient to support the assumptions stated in the

hypothetical question.  Further, we believe that this error was

prejudicial because the answer to the hypothetical was the very

essence of plaintiffs' case.  By sustaining defense counsel's

objection, the trial judge deprived plaintiffs of the opportunity

to establish that Carol's preeclampsia had become severe at least

by May 13, 1982, when Susan's brain was still "in reasonably good

condition."

     Plaintiffs also claim that the trial court erred in refusing

to allow plaintiffs to cross-examine Dr. William R. Hamilton from

four medical articles published after 1982, the year Susan was

born.  Plaintiffs state that their purpose in using the post-1982

articles was to "counter Dr. Hamilton's repeated statements that

Carbondale Memorial Hospital's ultrasound equipment was capable of

detecting periventricular leukomalacia in 1982."  (Emphasis added.) 

Plaintiffs claim that "Dr. Hamilton testified that ultrasound was

capable of detecting the lesion which eventually caused the baby's

cerebral palsy, but that the ultrasound instead indicated that the

baby's brain was `normal,' meaning that `the brain was put together

correctly' and that there were no `significant intercranial [sic]

abnormalities.'"  Plaintiffs argue that the logical inference is

that this negative ultrasound finding meant that there was no

lesion in the baby's brain as late as two days after the baby's

birth.  Plaintiffs claim that this inference "blew to smithereens

plaintiffs' theory that the brain lesion developed before birth"

because the baby had been left too long in a contaminated intra-

uterine environment.   

     It is important, for purposes of this issue, to note that

Susan's cerebral palsy was caused by a brain lesion known as

periventricular leukomalacia.  Dr. Hamilton began testifying on

July 18, 1989.  Dr. Hamilton was, at all relevant times, a

pediatrician concentrating in the practice of neonatology.  Dr.

Hamilton was directly involved in Susan's care from shortly after

her birth until she was eight months old.  On direct examination,

Dr. Hamilton testified that an intracranial ultrasound was

performed on Susan on May 26, 1982, when she was two days old.  He

stated that the examination was "unremarkable," meaning that it was

"normal."   On July 24, 1989, the following questions were asked of

Dr. Hamilton by plaintiffs' counsel:

     "Q.  And, Doctor, would you also agree, sir, that an

          ultrasound after birth would not show

          periventricular leukomalacia?

     A.   No.

     Q.   You won't agree with that?

     A.   No.

     Q.   Do you have any text there to support that state-

          ment, sir?

                                   * * *

     A.   Yes, Dr. Volpe has an article here in 1982, stating

          that ultrasound is correlated with the autopsy

          findings for periventricular leukomalacia.  

     Q.   Would you read *** what is says, Doctor?

                                   * * *

     A.   (Reading)  "Ultrasound scanning has been very

          useful in the evaluation of periventricular white

          matter injury.  Periventricular leukomalacia is

          visualized especially well when hemorrhagic, al-

          though nonhemorrhagic periventricular leukomalacia

          proved at postmortem examination is also demon-

          strated effectively."

     Defendants claim that these questions were not specific to

Susan and the ultrasound equipment at Carbondale Memorial Hospital

in 1982.  While we agree that the question and answer addressed the

capabilities of ultrasound equipment in general, it is clear that

Dr. Hamilton's statement regarding ultrasound capabilities in 1982

left the jurors with the inference that the ultrasound equipment at

Carbondale Memorial Hospital in 1982 was capable of picking up

periventricular leukomalacia.  In fact, the next day, on July 25,

1989, plaintiffs' counsel claimed that he was referring specifical-

ly to Carbondale Memorial Hospital's equipment when he asked the

aforementioned questions.  The relevant portion of the record is as

follows:

     "Q.  [by plaintiffs' counsel]  All right, Doctor.  You

          cited there was one 1982 article that was cited in

          Volpe as support for the -- for your statement or

          conclusion that ultrasound in 1982, as done in this

          hospital, could detect this periventricular

          leukomalacia.  Correct, sir?

     A.   [Dr. Hamilton]  That article was stated that --

     Q.   Excuse me.  My question is that you concluded from

          that, sir, that the Carbondale Memorial Hospital

          could detect periventricular leukomalacia with the

          ultrasound that they had at that time, did you not,

          sir?

     A.   I don't think that was the question, Mr. Carr.

     Q.   Well, Doctor, are you now saying that Carbondale

          Memorial Hospital did not have the capacity or this

          ultrasound that they performed at this particular

          date would not show periventricular leukomalacia? 

          Are you now saying that, sir?

     A.   No.

                                   * * *

     Q.   *** All right, is it still your belief, sir, that

          the ultrasound that they did here, this linear

          real-time ultrasound, could detect periventricular

          leukomalacia in Susan?

          MR. LYNCH [defense counsel]:  Your Honor, I do

     object, because the question yesterday was a general one

     and it should be not specific to Carbondale or Susan.

          MR. CARR [plaintiffs' counsel]:  It was specific to

     Carbondale.  This witness said, and we went through this

     sonogram --

          THE COURT:  Well, gentlemen, if we are going to

     start discussing what the evidence was from yesterday, we

     will have to send the jury out.  The jury will please go

     out."

Whereupon, the jury was excused and the following proceedings were

held outside their presence and hearing:

          "MR. CARR:  Your Honor, the last 30 minutes yester-

     day was taken up with going through this ultrasound and

     with the doctor explaining that this hospital was capable

     of detecting this lesion.  That's exactly what we were

     talking about.  We were discussing this particular

     ultrasound and his testimony to the effect that it could

     detect this lesion.  Now Mr. Lynch says that wasn't the

     testimony.  It clearly was the testimony of the doctor. 

     We went through line-by-line here, discussing this

     particular ultrasound.

          MR. LYNCH:  I am particularly objecting to any form

     of any questions and this specific question that implies

     some change in the doctor's testimony.  Mr. Carr asked

     the doctor a broad question:  Can an ultrasound or could

     an ultrasound in 1982 detect periventricular

     leukomalacia?  And then he just basically dug into a lot

     of specific questions about what the particular sonogram

     report showed.  Now, you know, the thing that I am

     objecting to -- and Mr. Carr is welcome to inquire as to

     the doctor's opinions, but the questions that seem to

     imply that he's changing his answers is what I am

     objecting to.

          MR. CARR:  I didn't ask the question that Mr. Lynch

     said that I asked.  I was asking specifically about this

     ultrasound in my questioning of the doctor, and his

     interpretation, his views as to the ability of the

     Carbondale Memorial Hospital to detect periventricular

     leukomalacia.  Mr. Lynch is now making some other

     objection than what he made in front of the jury.  He

     said there was no evidence that we were discussing this

     ultrasound.  That's what he said when the jury left, and

     that's what we were discussing yesterday, and that's what

     we are discussing this morning.

          MR. LYNCH:  I haven't changed what I said in front

     of the jury.  Mr. Carr did ask a lot of specific ques-

     tions about the ultrasound report.  The original question

     was:  Could an ultrasound in 1982 detect periventricular

     leukomalacia?  And I am not saying that the ultrasound

     report wasn't discussed, but he was not asked a question

     which Mr. Carr is now implying that he was, you know. 

     Did Carbondale Memorial Hospital, with this ultrasound in

     1982, have the capacity to detect periventricular

     leukomalacia?  That question wasn't asked.  

          MR. CARR:  That question was asked yesterday.  The

     doctor said that they did not [sic] have that capacity. 

     We discussed each line here, and it was pointed out that

     these -- this leukomalacia was not demonstrated in this

     report.  That's exactly what the doctor said.  The

     question that started this all off was I asked the doctor

     to agree that the ultrasound they had at the Carbondale

     Memorial Hospital could not detect periventricular

     leukomalacia.  He disagreed with that.  He would not

     agree with that.  He said, `No, it would detect it.'  And

     then we took out the ultrasound, and he pointed out that

     it wasn't detected, and it was his assertion.  Now, if he

     is now saying that he doesn't know whether or not the

     Carbondale Memorial Radiology Department had the capacity

     or whether or not this ultrasound could detect it, then

     he is changing his testimony, because that's clearly what

     he said yesterday, without a question.  And that's the

     whole reason for this line of examination today.  That's

     the whole reason that we have these articles, is to find

     out, clearly, that the Carbondale hospital did not have

     that capacity and could not do that, as this witness, now

     that he's read these articles or read some of these

     articles, is apparently going to agree with me.  Or else

     he is going to say now he has no opinion.  But that's

     clearly what he said yesterday in front of the jury."

The court, after reviewing the record, first paraphrased Dr.

Hamilton's  testimony from July 24, 1989.  The court then decided

that plaintiffs' counsel's question was not an improper question

based on the answers that Dr. Hamilton had given the day before,

but the court refused to allow plaintiffs' counsel to cross-examine

using post-1982 medical literature.  Because Dr. Hamilton left the

jurors with the inference that ultrasound at Carbondale Memorial

Hospital in 1982 could detect periventricular leukomalacia, we must

now determine whether plaintiffs' counsel should have been allowed

to impeach Dr. Hamilton's testimony with the post-1982 medical

articles.

     It is undisputed that when Dr. Hamilton was questioned about

the capacity of ultrasound in 1982 to detect periventricular

leukomalacia, he referred to a 1987 medical treatise entitled

Neurology of the Newborn (2d ed. 1987), written by Dr. Volpe. 

Within this 1987 medical treatise, all but one of the authorities

cited by Dr. Volpe were published after the ultrasound performed on

Susan on May 26, 1982.  

     Plaintiffs sought to discredit Dr. Hamilton's reliance upon

the authorities cited by Dr. Volpe by confronting him with the 1982

article authored by Volpe.  This article appeared in the journal

entitled Pediatrics.  The article discussed an ultrasound performed

after the infant's thirty-first day of life.  The infant died at 34

days of age.  The ultrasound disclosed "a densely echogenic area

indicative of hemorrhage."   Dr. Hamilton explained that this meant

that the ultrasound was detecting accumulations of blood in the

brain.  Periventricular leukomalacia does not necessarily produce

hemorrhaging.  In fact, hemorrhage was ruled out as a cause of

Susan's periventricular leukomalacia.  Dr. Hamilton agreed that the

ultrasound machine discussed in the 1982 article written by Dr.

Volpe was a rotary scanner that was "more apt to give a better

picture" than the linear scanner used on Susan at Carbondale

Memorial Hospital in 1982.  Hence, plaintiffs were able to

demonstrate that the 1982 authority cited in the 1987 medical

treatise did not support Dr. Hamilton's suggestion that the

ultrasound equipment used at Carbondale Memorial Hospital in 1982

was capable of detecting this condition in Susan.

     After plaintiffs' counsel attempted to cross-examine Dr.

Hamilton with the post-1982 medical articles, the trial judge

sustained defense counsel's objection that it is improper to use

post-1982 publications for the purpose of cross-examination in a

case involving malpractice allegedly committed in 1982.  The trial

court relied upon Karr v. Noel, 212 Ill. App. 3d 575, 571 N.E.2d

271 (1991), as its basis.

     In Karr v. Noel, 212 Ill. App. 3d at 583-84, 571 N.E.2d at

277, this court determined that literature containing medical

knowledge not available at the time of the alleged malpractice as

evidence of deviation from the standard of care at the time of the

alleged malpractice was highly prejudicial evidence.  Plaintiffs

claim, however, that they were not attempting to use the post-1982

articles as proof of malpractice, but rather for the express

purpose of impeaching Dr. Hamilton's statement that ultrasound

technology in 1982 was capable of detecting periventricular

leukomalacia.  We agree.

     After reviewing the record, it is clear that plaintiffs were

attempting to use the post-1982 medical articles to show the

diagnostic capabilities of ultrasound, not to show standard of

care.  While we agree that postevent literature should not be used

to show standard of care, it is proper to use postevent literature

for other purposes such as showing the diagnostic capabilities of

equipment.  Rules of evidence and law must be read and applied with

an understanding of the reason for the rule.  The reason that

medical literature that postdates the alleged malpractice is not

admissible is because no physician should have his conduct measured

by knowledge and standards not in existence at the time the conduct

at issue occurred.  The diagnostic capabilities of ultrasound

equipment was irrelevant to the standard of care issue in this

case.  If there was a deviation from the standard of care that

would subject defendants to liability, that deviation occurred

prior to birth.  However, the diagnostic capabilities of ultrasound

were critical to the issue of when Susan suffered her injury, i.e.,

before or after birth.  If an ultrasound examination performed

shortly after birth was capable of showing the presence of

periventricular leukomalacia, assuming it was present, and if the

examination was negative, that would be persuasive evidence that

the injury did not occur prior to birth.  But if the test was not

diagnostic for the condition, then a normal exam would simply be

irrelevant, at least on the question of when the condition

developed, because it would neither establish nor refute the

existence of the condition.  When Dr. Hamilton testified that the

test was diagnostic and cited medical literature to support his

testimony, it was essential to allow cross-examination to attempt

to impeach the doctor with contrary literature, whether that

literature was published during, before, or after 1982.  Hence, we

believe that the trial court abused its discretion in refusing to

allow plaintiffs' counsel the opportunity to cross-examine Dr.

Hamilton with the post-1982 medical articles.

     We recognize that at a different point in his testimony Dr.

Hamilton agreed with the following statement found on an exhibit:

     "BASED ON PRESENT-DAY KNOWLEDGE, THE PERIVENTRICULAR        

     LEUKOMALACIA WAS PRESENT, IN MY OPINION ON 5-26-82, BUT WAS

     NOT DETECTED BY THE ULTRASOUND PERFORMED ON THAT DATE.

          PER DR. HAMILTON

               7-25-89"

     Defendants claim that by virtue of this concession, plain-

tiffs' cross-examination with the post-1982 literature would have

been merely cumulative.  We disagree.  We believe that Dr.

Hamilton's repeated statement that ultrasound in 1982 could detect

periventricular leukomalacia prejudiced plaintiffs' case.   The

jury heard that there were a total of five medical articles

purportedly supporting Dr. Hamilton's suggestion that a 1982

ultrasound might have detected periventricular leukomalacia in

Susan.  Simply because Dr. Hamilton testified that, in his opinion,

the periventricular leukomalacia was present two days after Susan's

birth and was undetected by the ultrasound does not remedy the

prejudice caused by allowing the doctor's testimony on ultrasound

capabilities to go unrefuted and unimpeached.  Plaintiffs' counsel

should have been allowed to impeach the doctor with respect to each

of those articles.  This refusal to allow the impeachment consti-

tutes reversible error.  

     We have reviewed Dr. Pulido's contention that these errors do

not pertain to the case against her.  We agree. 

     As Dr. Pulido points out, plaintiffs' own expert testified

that the injury to Susan Granberry occurred well after Dr. Pulido

last saw Carol Granberry.  The plaintiffs' expert acknowledged that

while the medications prescribed by Dr. Pulido were inappropriate,

they neither helped nor hurt Carol or Susan Granberry.  The issue

of Dr. Pulido's negligence was submitted to the jury, and they

found in her favor.  After reviewing the evidence, we do not

believe that the evidentiary errors that are discussed elsewhere in

this decision impacted on the case against Dr. Pulido.  Therefore,

the verdict in favor of Dr. Pulido is affirmed.  

     Accordingly, we affirm in part and reverse in part the

judgment of the circuit court, and we remand this case to the trial

court for a new trial on all issues pertaining to the remaining

defendants.  

     Affirmed in part and reversed in part; cause remanded. 

     CHAPMAN, J., and RARICK, J., concur.

                                                          ATTACH A FRONT SHEET TO EACH CASE

___________________________________________________________________________

                                 NO. 5-92-0628

                                     IN THE

                          APPELLATE COURT OF ILLINOIS

                                 FIFTH DISTRICT

___________________________________________________________________________

SUSAN GRANBERRY, by her Mother and   )  Appeal from the

Next Friend, CAROL GRANBERRY; and    )  Circuit Court of 

CAROL GRANBERRY, Individually,       )  Jackson County.  

                                     )

     Plaintiffs-Appellants,          )  

v.                                   )  No. 84-L-55

                                     )  

CARBONDALE CLINIC, S.C., a           )

Corporation; JOSEPH C. TSUNG, M.D.;  )

and URDUJA PULIDO, M.D.,             )  Honorable

                                     )  George Oros, 

     Defendants-Appellees.           )  Judge, presiding.  

___________________________________________________________________________

Opinion Filed:                 November 13, 1996

___________________________________________________________________________

Justices:      Honorable Gordon E. Maag, J.

                         

               Honorable Charles W. Chapman, J., and

               Honorable Philip J. Rarick, J.,

               Concur

___________________________________________________________________________

                         

Attorneys      Rex Carr, Gerald L. Montroy, Michael B. Marker, Carr,

for            Korein, Tillery, Kunin, Montroy & Glass, 412 Missouri

Appellant      Avenue, East St. Louis, IL  62201

___________________________________________________________________________

Attorneys      Paul R. Lynch, Craig & Craig, 227½ South 9th Street, P.O. 

for            Box 1545, Mt. Vernon, IL 62864 (for Carbondale Clinic, S.C.)

Appellee       

               John E. Fick, Samuels, Miller, Schroeder, Jackson & Sly,

               406 First of America Center, P.O. Box 1400, Decatur, IL

               62525-1400 (for Joseph C. Tsung, M.D.)

               James E. Neville, Shari M. Brunton, Neville, Richards, 

               Defranco & Wuller, 5 Park Place Professional Centre, P.O.

               Box 20070, Belleville, IL 62220-0070 (for Urduja Pulido,

               M.D.)

___________________________________________________________________________